PEATROSS, J.
 

 11 After a bench trial, Harry Lee Richardson, Defendant, was convicted of aggravated rape, a violation of La. R.S. 14:42.
 
 *495
 
 Defendant was sentenced to the mandatory term of life imprisonment at hard labor without the benefit of probation, parole or suspension of sentence. Defendant now appeals. For the reasons stated herein, Defendant’s conviction and sentence are affirmed.
 

 FACTS
 

 During the late night or early morning hours of May 11, 1994, in Shreveport, Louisiana, 83-year-old C.T.
 
 [1]
 
 was at home alone, asleep in her bedroom, when two black males broke into her home and attacked her. C.T. was unable to recall exactly what time the attack occurred or how long it lasted. She reported that, at some point during the attack, she was rendered unconscious or fell asleep and when she awoke, the men were gone. After she regained consciousness, C.T. found that her telephone was not working and went outside her home seeking help.
 

 Ms. Vivian Patterson, C.T.’s longtime next-door neighbor, heard her cries for help around 6:30 or 7:00 a.m. Ms. Patterson went outside and found C.T. wandering in her yard, crying hysterically and dressed in pajamas and a robe with bloodstains on it. C.T. saw Ms. Patterson and told her about the attack. Other neighbors heard the commotion and came outside their houses. Shortly thereafter, the police were called. Officers responding to the scene found the point of entry on the southwest side of the victim’s house where a window screen and window panes had been |2removed. Following the initial investigation, no suspects were developed and the file ultimately became a “cold case.”
 
 [2]
 

 Thirteen years later, in 2007, DNA samples from the case were tested and a match was found utilizing CODIS.
 
 [3]
 
 The DNA of a black male named Rodney Washington matched the DNA found on samples taken from C.T. as part of her physical examination and rape kit which were administered after the attack. Detective Jeff Allday of the Shreveport Police Department (SPD) then began his “cold case” investigation into C.T.’s rape and found that a similar attack had occurred four blocks from C.T.’s home on July 15, 1994.
 

 In the July 1994 attack, Washington and Defendant were arrested and, four months later, pled guilty to aggravated burglary. Det. Allday requested a fingerprint analysis for the evidence collected in C.T.’s case,
 
 ie.,
 
 the fingerprint collected from the removed window screen on the southwest side of C.T.’s home, to known fingerprints of Washington and Defendant. After the analysis, it was determined that Defendant’s fingerprints matched those recovered from the removed window screen at the southwest side of C.T.’s home.
 

 Defendant was interviewed by police and, after initial denials, ultimately admitted to breaking into C.T.’s home with Washington. Defendant also initially denied participating in the rape and attack of C.T.; | sbut, during the latter half of the interview, Defendant claimed that Washington forced him to attack C.T., so he only simulated acts of intercourse with
 
 *496
 
 her. When pressed to explain further, however, Defendant admitted that it was possible that he could have penetrated C.T. while he was simulating the act of intercourse with her, but he was unsure because he was under the influence of drugs at that time.
 

 As previously mentioned, Defendant was arrested and charged
 
 [4]
 
 with aggravated rape in violation of La. R.S. 14:42. A bench trial was held in June 2010, wherein Defendant was convicted as charged and sentenced to the mandatory term of life imprisonment without the benefit of parole, probation or suspension of sentence. This appeal ensued.
 

 DISCUSSION
 

 Assignment of E-itov Number Three (verbatim):
 
 The evidence adduced at trial was insufficient to convict Harry Lee Richardson of aggravated rape.
 

 In his third assignment of error, Defendant contends that the State failed to present sufficient evidence at trial to support his conviction of aggravated rape. According to Defendant, the only evidence presented by the State connecting him to the crime was the fingerprint found on the removed window screen located on the southwest side of C.T.’s house. Defendant argues that he entered the home with Washington with only the intention of stealing money and food. Defendant claims that he had no intention of raping C.T. and was unaware that Washington planned to rape C.T. Defendant further claims that the scientific evidence in this case tends|4to exonerate him of the charge of rape because he was excluded as a possible donor of the DNA found on C.T. Defendant also asserts that the State failed to show that he was a principal to the rape since it was not proven that he aided or abetted in the rape in any way. We disagree.
 

 La. R.S. 14:41 defines “rape” as the act of anal, oral or vaginal sexual intercourse with a male or female person without the person’s lawful consent. Emission is not necessary and any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime. La. R.S. 14:41. At the time of the commission of the crime, La. R.S. 14:42 provided as follows:
 

 A. Aggravated rape is a rape committed upon a person sixty-five years of age or older or where the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
 

 (1) When the victim resists the act to the utmost, but whose resistance is overcome by force.
 

 (2) When the victim is prevented from resisting the act by threats of great and immediate bodily harm, accompanied by apparent power of execution.
 

 (3) When the victim is prevented from resisting the act because the offender is armed with a dangerous weapon.
 

 (4) When the victim is under the age of twelve years. Lack of knowledge of the victim’s age shall not be a defense.
 

 (5) When two or more offenders participated in the act.
 

 B. For purposes of Paragraph (5), “participate” shall mean:
 

 (1) Commit the act of rape.
 

 
 *497
 
 (2) Physically assist in the commission of such act.
 

 C. Whoever commits the crime of aggravated rape shall be Rpunished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
 

 Regarding principals, La. R.S. 14:24 provides:
 

 All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
 

 When issues are raised on appeal as to both the sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under
 
 Hudson v. Louisiana,
 
 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proven beyond a reasonable doubt.
 
 State v. Hearold,
 
 603 So.2d 731 (La.1992);
 
 State v. Bosley,
 
 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347,
 
 writ denied,
 
 97-1203 (La.10/17/97), 701 So.2d 1333.
 

 This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 05-0477 (La.2/22/06), 922 So.2d 517. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness.
 
 State v. Casey,
 
 99-0023 (La.1/26/00), 775 So.2d 1022,
 
 cert. denied,
 
 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). The reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law.
 
 Id.
 

 The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Eason,
 
 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685,
 
 writ denied,
 
 09-0725 (La.12/11/09), 23 So.3d 913;
 
 State v. Hill,
 
 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 07-1209 (La.12/14/07), 970 So.2d 529.
 

 The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983). An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution.
 
 State v. Sutton, supra.
 
 When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime.
 
 State v. Sutton, supra; State v. Speed,
 
 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582,
 
 writ denied,
 
 09-0372 (La.11/6/09), 21 So.3d 299;
 
 State v. Parker,
 
 42,311 (La.App.2d Cir.8/15/07), 963 So.2d 497,
 
 writ denied,
 
 07-2053 (La.3/7/08), 977 So.2d 896.
 

 |7In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient
 
 *498
 
 support for a requisite factual conclusion.
 
 State v. Gullette,
 
 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753;
 
 State v. Burd,
 
 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219,
 
 writ denied,
 
 06-1083 (La.11/9/06), 941 So.2d 35.
 

 The State’s first witness was T.S., who testified that her grandmother, C.T., lived alone at 228 West 69th Street in May 1994. T.S. also testified that C.T. was born on September 10, 1911, and had died three years prior to the beginning of the trial.
 

 The State’s next witness was former
 
 [5]
 
 SPD Officer Scott Spaulding, who testified that he was working for the sex crimes unit in May 1994 when he responded to a call that an elderly woman had been raped at 228 West 69th Street. Officer Spauld-ing was the lead investigator on the case; and, after speaking with patrol officers on the scene, he conducted a visual inspection of the house before attempting to speak to C.T. Officer Spaulding recalled that he was unable to conduct “much of an interview” with C.T. because she was extremely upset at that time.
 

 Officer Spaulding further testified that C.T. was transported to LSU Hospital where a rape examination was performed and evidence was obtained for the rape kit. C.T. was also treated for injuries to her knees. Officer Spaulding took possession of the evidence collected for the rape kit 18until it was submitted to the crime lab for testing. Officer Spaulding was unable to make any arrests for the crime in 1994.
 

 The State’s next witness was former
 
 [6]
 
 SPD Officer James B. Walker, who testified that he worked as an investigator in the sex crimes unit in 1994. Officer Walker testified that, on July 15, 1994, he responded to a residential burglary where officers discovered that the victim had been raped. Washington was arrested for the crime shortly thereafter; and, during his interview, he provided the name of Defendant as a suspect in the crime. Defendant was arrested on several unrelated outstanding warrants, transported to the police station and interviewed
 
 [7]
 
 with regard to the burglary and rape which occurred on July 15, 1994. Defendant admitted his involvement, was charged with aggravated burglary and pled guilty to the charge four months later in November 1994.
 

 The State’s next witness was SPD Officer Danny Duddy of the crime scene investigations unit. Officer Duddy was qualified as an expert in the field of crime scene reproduction and fingerprint analysis. Officer Duddy testified that, at the crime scene, a point of forced entry was found at a window on the southwest side of the house where the window screen and pane had been removed. Officer Duddy noted that the inside of the house appeared neat, but blood was found on the sheets in a rear bedroom. The bedding was seized by officers and later tested for DNA evidence. An open 19wallet was found on the dresser and a checkbook was found on the floor next to the bed.
 

 Officer Duddy obtained an identifiable fingerprint on the window screen that had been removed from the point of entry into the house. The fingerprint was preserved as evidence along with the other items seized from the house. At that time in 1994, Officer Duddy had no identified suspects, so no comparison was made with the fingerprint evidence.
 

 
 *499
 
 Officer Duddy further testified that, in 2007, Det. Allday contacted him and requested that the fingerprint from C.T.’s case be compared to known fingerprints for Defendant and another black male, Washington. Officer Duddy performed the fingerprint analysis and concluded that the fingerprint from the removed window screen on the southwest side of C.T.’s home and the fingerprints on file linked to Defendant were a match.
 

 Defendant was also fingerprinted in open court. Officer Duddy made a comparison of those fingerprints to the fingerprint analysis originally conducted linking known fingerprints from Defendant to the fingerprints on the removed window screen outside of C.T.’s home and concluded that the prints were a match. Additionally, fingerprints from the bill of information from the previous case
 
 [8]
 
 in July 1994 were examined and compared to Defendant’s known fingerprints and Officer Duddy concluded that those fingerprints were also a match.
 

 Another witness for the State was Ms. Patterson, C.T.’s neighbor. Ms. Patterson testified that she and C.T. had lived next door to each other |1flfor approximately 42 years and were “close neighbors” and friends. On the day of the incident, Ms. Patterson was in her kitchen between 6:30 a.m. and 7:00 a.m. when she heard someone hollering very loudly, “Someone help me! Someone help me!” Ms. Patterson went outside and saw C.T. walking in the yard between their houses before hurriedly walking over to Ms. Patterson’s yard. Ms. Patterson noticed that C.T. was very upset, nearly hysterical and wearing her pajamas and a robe with bloodstains on it. Over Defendant’s objection, Ms. Patterson was questioned regarding what C.T. told her that morning. Ms. Patterson testified:
 

 She said, “Two Negros [sic ] broke into my house last night and,” [She] said, “they raped me over and over. They stole my valuables, my jewelry and some more valuables.” She didn’t say what else, but just “my valuables.” And she said, “It seems that they were there all night.”
 

 Ms. Patterson further testified:
 

 I just tried to console her. And I asked her couldn’t she — could she have tried to get help or, you know, do something. And she said, No, they threatened me that if I screamed or tried to get help, they would harm her [sic]. And she said, “And, too, I found out they tore up” — “my phone lines were disconnected when I came to, and they were gone.”
 

 [[Image here]]
 

 When asked if the victim stated how long the perpetrators were in the house, Ms. Patterson testified as follows:
 

 No, she didn’t say and didn’t really have an idea.... I says [sic], “How long, you know, did this go on?” I said, ‘When did they break in?” And she says [sic], I don’t know what time it was, and they were doing so much and all until I either passed out or maybe they went out of the room and I dozed off or something happened.” [She] [s]aid, “I probably passed out. And when I woke up, they were gone.”
 

 | uMs. Patterson recalled that her husband
 
 [9]
 
 was present when C.T. related her recollection of the events and that the conversation lasted between five and ten minutes. Several other neighbors came outside in response to C.T.’s calls for assis
 
 *500
 
 tance and one of the neighbors contacted police, who arrived shortly thereafter.
 

 During the trial, the State introduced other crimes evidence,
 
 ie.,
 
 testimony from the victims of the July 15, 1994 aggravated burglary that occurred a few months after the attack against C.T. One of the victims of the July 1994 case, D.P., testified that she and her three children were residing in the 400 block of East 65th Street and, during the early morning hours, she was awakened by the sound of her dogs barking. When she sat up in her bed, D.P. could see the shadow of a person peeking into her bedroom from the open bedroom door. D.P. sprang from her bed and attempted to turn on the bedroom light; but, before she could reach the light switch, the person who had been standing in the bedroom doorway grabbed her around her neck. According to D.P., the man who grabbed her “was barking orders at the other man,” who was in the hallway, to take the kids up to the front room and keep them there. The man then pushed D.P. down on her bed and choked her. Prior to losing consciousness, D.P. heard her children crying and yelling from another room.
 

 When D.P. regained consciousness, the man holding her told her that he would kill her children if she did not do what he said. The man then raped D.P. She testified that she was unsure if he penetrated her, but she |12knew “he put his mouth down there.” D.P. further testified that she was uncertain as to what else he did to her because she tried to block everything out. D.P. was unsure how long the attack lasted, but she believed an hour had passed when a police officer pulled up to the house and began using a searchlight to look inside the house. The intruders then ran to the window they used to enter the home and left.
 

 D.P. testified that the man in the living room appeared to take orders from the man who was assaulting her. After the police arrived and began investigating, officers discovered that the men had entered the home through a window of an unoccupied bedroom where the screen had been removed. D.P. testified that she had never been able to identify either of the perpetrators.
 

 D.P.’s son, J.P., testified that he was about 10 years old when the incident happened in July 1994. J.P. testified that he was awakened by the sound of dogs barking and his mother’s screams. When he walked toward his mother’s room, he saw two men in the room, one holding his mother on the bed and the other man standing near the bed. When the men noticed J.P. in the doorway, the man standing near the bed took him back into the living room of the house where he and his sisters had been sleeping. J.P. sat on the floor with his youngest sister while his older sister sat on the sofa. The man who was in the room with them sat next to his older sister on the sofa and began touching his sister on various parts of her body. When the man saw police vehicle lights outside the house, he ran out of the house through 113the front door. J.P. was unsure when or where the man who had been in his mother’s room exited the house.
 

 D.P.’s daughter, M.P., also testified with regard to the July 1994 attack. M.P. testified that she was seven years old at the time of the attack. She recalled first hearing her mother screaming in the middle of the night. M.P. and her brother then walked to their mother’s room and saw a man choking their mother while another man stood by the door. The man choking the children’s mother ordered the man standing near the door to take the children back into the living room. The man walked them back to the living room and
 
 *501
 
 told M.P. to sit in a chair. Once M.P.’s brother and sister were seated on the floor, the man told M.P. to remove her clothes, so she did. M.P. testified that the man began touching her “everywhere,” including her hair, face, arms, stomach, legs and in between her legs. He then pulled down his shorts and started rubbing his penis on M.P.’s vagina. M.P. stated that the man “started to go in me,” but the police arrived, so he got up, yelled to the other assailant and ran out of the front door. M.P. was not sure where the other man ran or how he left the house.
 

 Another witness for the State was SPD Det. Allday who testified that he was assigned to work the May 1994 “cold case” involving C.T. Det. Allday testified that DNA evidence from C.T.’s case was tested and matched with evidence found in the CODIS database for Washington. Det. Allday then found the report regarding the incident involving D.P. where Washington and Defendant had been arrested. Det. Allday observed that the two crimes had occurred within four blocks of each other. [ 14Pet. Allday requested a fingerprint comparison of the fingerprint from the window screen on the southwest side of C.T.’s home to the known fingerprints of Defendant and Washington and discovered a match to Defendant. Det. Allday re-interviewed several of the case witnesses, including C.T., and learned during his interview with C.T. that she would not be competent to testify at a trial.
 

 Det. Allday then located Defendant, advised him of his Miranda
 
 [10]
 
 rights, obtained a waiver of rights form and subsequently conducted a recorded interview at the police station. During the interview, Defendant initially denied his involvement altogether, but later admitted to breaking into C.T.’s home with Washington wherein he claimed to have been forced by Washington to sexually assault C.T. Defendant stated that he only intended to simulate the act of intercourse with C.T., but then admitted that it was possible that he could have penetrated the victim though he could not be certain since he was heavily intoxicated from drugs and alcohol at the time. At the conclusion of the interview, Det. Allday obtained a DNA sample from Defendant
 
 via
 
 buccal swab pursuant to a search warrant. Defendant’s connection to the crime was established through his fingerprint found at the scene, as well as through his confession.
 

 Dr. Linda Prentis also testified for the State as an expert in the fields of obstetrics and gynecology. Dr. Prentis conducted C.T.’s physical examination and collected evidence for the rape kit. During the examination, Dr. Prentis learned from C.T. that she had been assaulted by 11fitwo men who performed anal and vaginal sex on her. Dr. Prentis collected hair samples and fingernail scrapings and conducted a complete physical examination of C.T. Dr. Prentis observed during the exam that C.T. was tearful and trembling and had blood on the upper portions of her leg and in the areas around her vagina and rectum. Blood and fluid were found inside C.T.’s vagina; and, according to Dr. Pren-tis, this typically would not be found in the vagina of a woman that was C.T.’s age unless there was some type of vaginal trauma that caused a tear in the “delicate lining of the vagina.” C.T.’s injuries were consistent with her complaints of being “sexually penetrated.” C.T. reported to Dr. Prentis that she had not had intercourse since March 1970, approximately 24 years prior to the rape.
 

 Ms. Anna Komitov also testified for the State as an expert in the field of DNA analysis. Ms. Komitov conducted the sec
 
 *502
 
 ond round of DNA testing and issued her findings in a supplemental report. As a result of her testing and analysis of the anal swab taken from the physical examination of C.T., Ms. Komitov concluded that Washington could not be excluded as a donor of the seminal fluid found thereon. Defendant’s DNA was not found in any of the samples tested.
 

 The State and Defendant entered a stipulation regarding the testimony of Connie Brown, who would have qualified as an expert in the field of forensic DNA analysis. Ms. Brown would have testified that she analyzed the panties collected from C.T. at the hospital and that the analysis determined that semen was present on the panties. The DNA profile was entered into the CODIS system and returned as a match for Washington.
 

 [lfiAt this point in the trial, the State rested its case. The defense did not present any witnesses and rested its case.
 

 We find that the evidence presented at trial by the State was sufficient to support Defendant’s aggravated rape conviction. The State was able to establish through the testimony of the victim’s granddaughter that the victim was older than 65 years of age at the time of the incident. Through the testimony of Ms. Patterson and Dr. Prentis, the State was able to show that C.T. reported that she had been attacked in her home by two men who raped and robbed her and prevented her from resisting by threats of violence against her. C.T.’s statements regarding her injuries and the attack were corroborated by Dr. Prentis’s physical examination, which was conducted shortly after the attack was reported. Moreover, DNA testing confirmed that Washington’s seminal fluid was found on or near C.T.’s anus, as well as on the panties she was wearing when she arrived at the hospital.
 

 The fact that Defendant’s DNA was not found on C.T. does not exonerate him of the crime. Defendant, by his own admission, participated in the rape by “pretending” to rape C.T. Further, Defendant admitted that it was possible that he penetrated the victim. Emission is not required to sustain a conviction of aggravated rape. La. R.S. 14:41.
 

 Defendant’s own admission and DNA evidence proved that Defendant was an active participant in breaking into C.T.’s home. There is no evidence in the record to support Defendant’s allegations that he only entered C.T.’s house for food and money or that he was intimidated or scared into attacking and raping C.T.
 

 | ^Additionally, the crimes committed against C.T. in May 1994 were very similar to the crimes committed against D.P. and her children in July 1994. DNA evidence linked both Washington and Defendant to the crimes in that, in both incidents, they entered the windows of the victims’ homes during the late night/early morning hours and committed sexual assaults against them. Considering all the evidence presented at trial, a reasonable trier of fact could have determined that the evidence was sufficient to support Defendant’s aggravated rape conviction.
 

 This assignment of error is without merit.
 

 Assignment of Error Number One (verbatim):
 
 The trial court erred in admitting hearsay testimony from Vivian Patterson regarding statements made to her by [C.T.].
 

 In his first assignment of error, Defendant argues that the testimony of the statements made to Ms. Patterson by C.T. were inadmissible hearsay and that the admission of those statements into evidence violated his Sixth Amendment right to confront his accusers. Defendant contends that the State failed to prove the
 
 *503
 
 exact length of time between the attack and the moment when C.T. reported the incident to Ms. Patterson; and, consequently, it is impossible to determine if C.T.’s statements were excited utterances. Defendant further asserts that, if this court determines that C.T.’s statements were excited utterances, their admission into evidence, nevertheless, violated Defendant’s right to confront the witnesses against him. Defendant contends that C.T.’s statements should be considered testimonial and, therefore, inadmissible. We disagree.
 

 hsLa. C.E. art. 801 provides that hearsay is an oral or written assertion, other than one made by the declarant while testifying at the present trial or hearing, offered into evidence to prove the truth of the matter asserted. Hearsay evidence is not admissible except as otherwise provided by the Code of Evidence or other legislation. La. C.E. art. 802. Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter, who is not subject to cross-examination and other safeguards of reliability.
 
 State v. Martin,
 
 458 So.2d 454 (La.1984).
 

 An excited utterance is a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition; the statement is not excluded by the hearsay rule, even though the declarant is available as a witness. La. C.E. art. 803(2). This exception requires an occurrence or event sufficiently startling to render the declarant’s normal reflective thought process inoperative.
 
 State v. Martin,
 
 39,846 (La.App.2d Cir.8/17/05), 913 So.2d 863,
 
 writ denied,
 
 06-0110 (La.6/14/06), 929 So.2d 1267;
 
 State v. Reaves,
 
 569 So.2d 650 (La.App. 2d Cir. 1990),
 
 writ denied,
 
 576 So.2d 25 (La.1991). Furthermore, the statement of the declar-ant must have been a spontaneous reaction to the occurrence or event and not the result of reflective thought.
 
 State v. Henderson,
 
 362 So.2d 1358 (La.1978).
 

 In determining whether the de-clarant was under the stress of excitement caused by an event, the courts consider the time span between the event and the statement the most important factor. The trial court must determine whether the interval between the event and the statement was of | ^sufficient duration to permit a subsidence of emotional upset and a restoration of a reflective thought process.
 
 State v. Jasper,
 
 28,187 (La.App.2d Cir.6/26/96), 677 So.2d 553,
 
 writ denied,
 
 96-1897 (La.2/21/97), 688 So.2d 521. Additional factors that may indicate that a statement was the result of a reflective thought are evidence that the statement was self-serving, made in response to an inquiry, an expansion of the excited utterance beyond a description of the event and into past or future facts or proof that, between the event and the statement, the declarant performed tasks that required a reflective thought process.
 
 Henderson, supra; Jasper, supra.
 
 These factors, however, do not automatically justify exclusion.
 
 Henderson, supra; Jasper, supra.
 
 The Louisiana Supreme Court has long held that the admission of hearsay testimony is harmless error where the effect is merely cumulative or corroborative of other testimony adduced at trial.
 
 State v. Johnson,
 
 389 So.2d 1302 (La.1980);
 
 State v. McIntyre,
 
 381 So.2d 408 (La.1980),
 
 cert. denied,
 
 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 90 (1980).
 

 The confrontation clause of the Sixth Amendment provides that “[in] all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” U.S. Const. Amend. VI. This bedrock procedural
 
 *504
 
 guarantee applies to both federal and state prosecutions.
 
 Crawford v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004);
 
 Pointer v. Texas,
 
 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The Sixth Amendment safeguards the defendant’s right to confront his accusers and to subject them testimony to rigorous testing in an ^adversary proceeding before the trier of fact.
 
 California v. Green,
 
 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).
 

 The confrontation clause acts as an absolute bar on the admission of all out-of-court testimonial evidence unless: (1) the witness who made the statement is unavailable to testify in court, and (2) the defendant had a prior opportunity to cross-examine the witness.
 
 Crawford v. Washington, supra; State v. Smith,
 
 04-3140 (La.6/24/05), 906 So.2d 391. Confrontation rights claims are subject to harmless error analysis.
 
 Delaware v. Van Arsdall,
 
 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986);
 
 State v. Robinson,
 
 01-0273 (La.5/17/02), 817 So.2d 1131.
 

 Ms. Patterson’s testimony regarding C.T.’s statements was an oral assertion being offered in evidence to prove the truth of the matter asserted. To be admissible, therefore, C.T.’s statements would have to meet an exception to the hearsay exclusion. C.T.’s statements were made to Ms. Patterson following the traumatic events of rape and robbery during which time C.T. was crying, nearly hysterical and seeking help. Officer Spaulding recalled that he was unable to conduct “much of an interview” because C.T. was extremely upset at the time he arrived on the scene, this being some time after C.T. initially spoke to Ms. Patterson.
 

 While the time span between the incident and the victim’s statements about the incident is a factor to be considered, it is not the lone determining factor. Even without knowing exactly when the perpetrators left her home, C.T. was certainly still under the stress of excitement caused by the rape and robbery that had taken place. Considering C.T.’s age, her perceived length | ⅞] of the event, as well as her state of mind and demeanor when she reported the events to Ms. Patterson, it can reasonably be concluded that C.T. was still under the stress of excitement caused by the startling events. We, therefore, find no error in the trial judge’s ruling that C.T.’s statements to Ms. Patterson fell under the excited utterance exception to the hearsay exclusion and, thus, were properly admissible into evidence.
 

 Defendant further argues, however, that his constitutional right to confrontation was violated by admission of the statements because C.T. was unavailable to testify at the trial since she died prior to the beginning of the proceedings.
 

 Under the
 
 Crawford v. Washington, supra,
 
 analysis, given C.T.’s unavailability to testify at trial, the admissibility of C.T.’s statements depends upon whether or not they were testimonial in nature. In
 
 State v. Griffin,
 
 45,045 (La.App.2d Cir.1/27/10), 30 So.3d 1039,
 
 writ denied,
 
 10-0447 (La.9/17/10), 45 So.3d 1043, this court, citing
 
 Crawford, supra,
 
 noted the following:
 

 The court in
 
 Crawford
 
 declined to provide an explicit definition of testimonial evidence, but the opinion explains: An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The fact that a statement is made to a person who is not a government officer does not, as a bright line, necessarily mean that the statement is not “testimonial” within the ambit of the Sixth Amendment. Courts have been much more reluctant, however, to find a statement made to a non-governmental
 
 *505
 
 officer to be testimonial. For example, in
 
 State v. Heggar,
 
 39,915 (La.App.2d Cir.8/17/05), 908 So.2d 1245, this court found the present-sense impressions of a victim made over the telephone to a witness immediately prior to the victim’s murder to be non-testimonial in nature. There was nothing to suggest that the victim believed that his statements would ever be used for ^formal purposes such as a trial.
 
 See also State v. Parks,
 
 08-423 (La.App. 5th Cir.11/25/08), 2 So.3d 470,
 
 writ denied,
 
 09-0142 (La.10/2/09), 18 So.3d 101.
 

 In the case
 
 sub judice,
 
 C.T.’s statements to Ms. Patterson were merely an attempt to explain her situation to her neighbor so she could get help following the traumatic event. Considering C.T.’s near hysterical state, as described by Ms. Patterson, it is impossible to conclude that C.T. believed the statements she was making at that time, in an effort to get help after being raped and robbed in her home, would ultimately be used in a formal proceeding. Considering the totality of the circumstances, it can reasonably be concluded that C.T.’s statements to Ms. Patterson were not testimonial in nature and Defendant’s argument to the contrary is without merit.
 

 Assignment of Error Number Two (verbatim,):
 
 The trial court erred in admitting other crimes evidence, specifically, evidence of a subsequent incident involving [D.P.],
 

 In his second assignment of error, Defendant argues that the trial judge erroneously admitted testimony and evidence regarding his prior conviction for aggravated burglary and the sexual assaults that occurred during the burglary. Defendant argues that the State only presented this evidence to portray him as a “bad man.” He further asserts that the evidence was not necessary or relevant to the State’s presentation of the instant case and that the prejudicial effect of the other crimes evidence outweighed its probative value. Again, we disagree.
 

 Generally, evidence of other acts of misconduct is not admissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes that he is a “bad | ^person.” La. C.E. art. 404(B)(1);
 
 State v. Jackson,
 
 625 So.2d 146 (La.1993). This rule of exclusion stems from the “substantial risk of grave prejudice to the defendant” from the introduction of evidence regarding his unrelated criminal acts.
 
 State v. Prieur,
 
 277 So.2d 126 (La.1973).
 

 Evidence of other crimes, however, may be admissible if the State establishes an independent and relevant reason,
 
 i.e.,
 
 to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404(B)(1);
 
 State v. Roberson,
 
 40,809 (La.App.2d Cir.4/19/06), 929 So.2d 789. Even when other crimes evidence is offered for a purpose allowed under Article 404, the evidence is still not admissible unless it tends to prove a material fact at issue or to rebut a defense. The probative value of the extraneous crimes evidence must outweigh its prejudicial effect. La. C.E. art. 403;
 
 State v. Jacobs,
 
 99-0991 (La.5/15/01), 803 So.2d 933,
 
 cert. denied,
 
 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002);
 
 State v. Hatcher,
 
 372 So.2d 1024 (La.1979).
 

 A trial court’s ruling on the admissibility of other crimes evidence will not be overturned absent an abuse of discretion.
 
 State v. Scales,
 
 93-2003 (La.5/22/95), 655 So.2d 1326,
 
 cert. denied,
 
 
 *506
 
 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996);
 
 State v. Caston,
 
 43,565 (La.App.2d Cir.9/24/08), 996 So.2d 480;
 
 State v. Cooks,
 
 36,613 (La.App.2d Cir.12/4/02), 833 So.2d 1034.
 

 | ?/[For evidence of other crimes to be admissible, the state must: 1) prove with clear and convincing evidence that the other acts or crimes occurred and were committed by the defendant; 2) demonstrate that the other acts satisfy one of the requirements of La. C.E. art. 404 B(l),
 
 i.e.,
 
 motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident; and 3) show that the probative value of the evidence outweighs its prejudicial effect.
 
 State v. Jackson, supra.
 

 In the case
 
 sub judice,
 
 the State initially provided notice to Defendant that it intended to present evidence of three prior crimes involving obscenity, forcible rape and aggravated burglary. Evidence of these crimes was presented during the
 
 Prieur
 
 hearing. At trial, however, the State only presented evidence of the prior conviction for aggravated burglary.
 

 Based on the record before this Court, it does not appear that the trial judge erred in admitting the other crimes evidence. The State presented testimony from the victims of an aggravated burglary in which a mother and her daughter were sexually assaulted. The State contends that it admitted the evidence to show opportunity, intent, plan, knowledge and identity.
 

 The State was able to prove with clear and convincing evidence,
 
 ie.,
 
 DNA fingerprint analysis, that the other acts or crimes occurred and were committed by Defendant. Despite the fact that the July 1994 aggravated burglary occurred after the instant offense, it was, nevertheless, properly admissible to show intent, identity and knowledge. The “other crime” was committed in a similar fashion as the instant offense, where Defendant and Washington broke into the victims’ homes through a window during the late l2snight/early morning hours and then sexually assaulted them. Both crimes occurred within a short radius of each other, both locations were near Defendant’s home and the two crimes happened within a few months of each other.
 

 Additionally, the State was able to show that the probative value of the evidence outweighed its prejudicial effect. The similarity of the acts in both crimes was highly probative of Defendant’s criminal intent, identity and knowledge. Accordingly, we find no error in the trial judge’s ruling admitting the other crimes evidence at trial.
 

 This assignment of error is without merit.
 

 Assignment of Error Number Four (verbatim):
 
 The sentence of life in prison without benefit of probation, parole, or suspension of sentence is excessive under the facts and circumstances of this case.
 

 In his fourth assignment of error, Defendant argues that, despite the mandatory nature of the sentence for aggravated rape, his sentence is excessive under the facts and circumstances of this case. Defendant supports this assertion by pointing out that the offense against the victim took place 13 years before prosecution was instituted and 16 years before trial. Defendant also contends that his “pretending to participate in a rape out of fear for his life hardly makes [him] the worst of offenders.” Finally, Defendant argues that a lesser sentence would be appropriate considering the fact that Washington received an 80-year sentence. We are not persuaded by Defendant’s arguments.
 

 The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record
 
 *507
 
 must show 12r,that the trial judge took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article.
 
 State v. Smith,
 
 438 So.2d 688 (La.1983);
 
 State v. Lathan,
 
 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890,
 
 writ denied,
 
 07-0805 (La.3/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions.
 

 Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1.
 
 State v. Lanclos,
 
 419 So.2d 475 (La.1982);
 
 State v. Swayzer,
 
 43,350 (La.App.2d Cir.8/13/08), 989 So.2d 267,
 
 writ denied,
 
 08-2697 (La.9/18/09), 17 So.3d 388. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, the seriousness of the offense and the likelihood of rehabilitation.
 
 State v. Jones,
 
 398 So.2d 1049 (La.1981);
 
 State v. Ates,
 
 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259,
 
 writ denied,
 
 08-2341 (La.5/15/09), 8 So.3d 581. There is no requirement that specific matters be given any particular weight at sentencing.
 
 State v. Shumaker,
 
 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277,
 
 writ denied,
 
 07-0144 (La.9/28/07), 964 So.2d 351.
 

 Second, a sentence violates La. Const. Art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a | ^purposeless and needless infliction of pain and suffering.
 
 State v. Smith,
 
 01-2574 (La.1/14/03), 839 So.2d 1;
 
 State v. Dorthey,
 
 623 So.2d 1276 (La.1993);
 
 State v. Bonanno,
 
 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice.
 
 State v. Weaver,
 
 01-0467 (La.1/15/02), 805 So.2d 166;
 
 State v. Lobato,
 
 603 So.2d 739 (La.1992);
 
 State v. Robinson,
 
 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379;
 
 State v. Bradford,
 
 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864.
 

 Where there is a mandatory sentence, there is no need for the trial judge to justify, under article 894.1, a sentence it is legally required to impose.
 
 State v. Burd, supra; State v. Koon,
 
 31,177 (La.App.2d Cir.2/24/99), 730 So.2d 503.
 

 In
 
 State v. Dorthey, supra,
 
 the supreme court held that, in habitual offender cases, the downward departure from a mandatory minimum sentence may occur in rare circumstances if the defendant rebuts the presumption of constitutionality by showing clear and convincing evidence that he is exceptional, namely, that he is a victim of the legislature’s failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender and the circumstances of the case.
 
 Id.
 
 This rule has been extended to mandatory sentences beyond habitual offender cases.
 
 State v. Fobbs,
 
 99-1024 (La.9/24/99), 744 So.2d 1274;
 
 State v. Chandler,
 
 41,063 (La.App.2d Cir.9/8/06), 939 So.2d 574,
 
 writ denied,
 
 06-2554 (La.5/11/07), 955 So.2d 1277.
 

 | ¡y/rhe “rare circumstances” under which a mandated sentence can be altered are even less likely in the case of a life sentence chosen by the legislature for a single crime, such as aggravated rape or second degree murder.
 
 State v. Chandler, supra.
 
 In such crimes, unlike the mandatory minimum sentence under the habitual offender law, the “tailoring” of the sentence by the legislature was for life because the culpability of the offender and the gravity of the offense are so great.
 
 Id.
 

 
 *508
 
 In the case
 
 sub judice,
 
 Defendant has failed to present any evidence that would warrant or justify a downward departure from the mandatory life sentence imposed by the trial judge. Defendant has a history of sexually assaultive behaviors and crimes against persons. He has provided no meritorious argument to substantiate his request for a lesser sentence and he has failed to show that rare circumstances exist in this case.
 

 Considering the heinous nature of the crime committed against Defendant’s elderly, defenseless victim, we cannot say that this sentence is grossly out of proportion to the seriousness of the offense, nor is it nothing more than a purposeless and needless infliction of pain and suffering. Moreover, Defendant’s punishment, when viewed in light of the harm done to society, does not shock the sense of justice.
 

 This assignment of error is without merit.
 

 CONCLUSION
 

 For the foregoing reasons, the conviction and sentence of Defendant, Harry Lee Richardson, are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . In accordance with La. R.S. 46:1844, all victims mentioned in this case will be referred to by their initials instead of their names.
 

 [2]
 

 . In general, a case becomes a "cold case” when detectives are unable to develop legitimate leads and/or suspects and, as a result, investigation efforts cease to continue.
 

 [3]
 

 .The "Combined DNA Index System” is a database funded by the United States Federal Bureau of Investigation (FBI) that stores DNA profiles created by federal, state and local crime laboratories in the United States which can be electronically searched to assist in the identification of crime suspects.
 

 [4]
 

 . In the original indictment, Defendant was also charged with armed robbery in violation of La. R.S. 14:64; however, the charge was later dismissed by the State prior to the commencement of trial.
 

 [5]
 

 . Currently retired.
 

 [6]
 

 . Currently retired.
 

 [7]
 

 .A free and voluntary hearing was conducted and the trial judge ruled that Defendant's statement during this interview was freely and voluntarily made and was, therefore, admissible.
 

 [8]
 

 .
 
 State v. Harry Lee Richardson,
 
 Docket No. 170,806 (Aggravated burglary).
 

 [9]
 

 . Ms. Patterson’s husband was in poor health and unable to attend the court proceedings.
 

 [10]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).