22 So.3d 232 (2009)
STATE of Louisiana, Appellee
v.
Charles HARRIS, Appellant.
No. 44,613-KA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 2009.
Rehearing Denied October 22, 2009.
*233 Burnes, Burnes & Talley, by Dmitrc I. Burnes, Alexandria, for Appellant.
Jonathan M. Stewart, District Attorney, Kenneth P. Haines, Tammy G. Jump, Assistant District Attorneys, for Appellee.
*234 Before BROWN, STEWART and DREW, JJ.
STEWART, J.
The defendant, Charles Harris, was convicted of attempted second degree murder and sentenced to 15 years of imprisonment without benefits. Arguing that the verdict was contrary to the law and evidence, that the jury was given erroneous instructions, and that he received ineffective assistance of counsel, the defendant appeals his conviction. For the reasons that follow, we affirm the defendant's conviction.

FACTS
By bill of information, the defendant was charged with attempted second degree murder of Lorenzo Stafford on September 23, 2006. The incident occurred in the area of Washington Street in Ringgold. Officer Nathaniel Coe of the Ringgold Police Department and Deputy Justin Sullivan of the Bienville Parish Sheriff's Department responded to a call reporting a fight and shots fired. They were met by a woman, Darnell Arrington, who reported that Stafford had barricaded himself in a trailer on the property. They found the defendant on the ground by a car parked nearby. There was blood in the car. Harris said that Stafford had beat him on the back with a shotgun. Arrington then called out for help stating that Stafford had been shot. He was in the trailer with a large hole in his right lower back area. Blood was all over the floor of the trailer. Stafford said that Harris shot him with a sawed-off shotgun that had both ends cut off. Harris admitted to Officer Coe that he shot Stafford. He explained that he owed Stafford money and that he had thought Stafford was going to kill him.
Photographs taken of the scene show a car with the driver's side door open and blood along the right front and back of the driver's seat area. Two cell phones and some keys were in the grass by the vehicle. The officers did not find the sawed-off shotgun that night.
Both men were transported to a Minden hospital. Chief Deputy Randy Price of the Bienville Parish Sheriff's Office continued the investigation by attempting to interview Harris, who was in the process of being discharged and said by a nurse to be alert and responsive. However, Harris would not make eye contact with Price and acted as if he were in severe pain. Stafford, who had life-threatening injuries, was transferred to LSU Medical Center in Shreveport where he underwent surgery to remove his spleen and repair his diaphragm. His treating physician, Dr. Cuthbert Simpkins, opined that the gunshot appeared to have been made at close range as the wound was a well circumscribed injury, with many pellets in the flank area.
When Stafford was able to give a statement on October 3, 2006, he described the gun used to shoot him. A sawed-off shotgun matching the description given by Stafford had been found by the officers in a search of the scene the morning after the incident. The gun was recovered from the top of a shed on the property.
After his arrest, the defendant waived his Miranda rights and gave a recorded statement which was played for the jury. The defendant stated that he had borrowed $4,500 from Stafford in March and was to pay back $6,000 by mid-August. He claimed the money was delivered to him by masked men in a black Honda and that they threw the money in his car. When he did not have the money to pay back in August, he contacted Stafford and arranged a meeting. At the designated spot he was met by masked men in a white van who blindfolded him, bound him with rope, roughed him up, and finally "gassed" *235 him through a gas mask until he was unconscious. He claimed that he gave the men $3,000 on that occasion. A week later he arranged to meet Stafford by Willis-Knighton South in Bossier City to pay the remaining $3,000. Again, Harris claimed he was met by men in a white van who forced him inside the van and roughed him up as a warning to be "more professional" next time he borrows money.
The defendant then claimed that Stafford contacted him demanding another $1,000 as "late charges." The defendant offered to sell Stafford a piece of property with the $1,000 subtracted from the price. On the day of the incident, the defendant picked Stafford up to show him the property. He claimed that Stafford got into the car with a shotgun, which the defendant described in the statement as a single-barrel gun, and said that he was "going to bust it off a couple of times ... down in the hole."
When they got to the property, Stafford stayed by the car while he walked to the trailer and spoke to someone about moving some debris off the property. The defendant returned to the car to find Stafford standing beside it with the shotgun on the top of the car. While discussing whether Stafford would buy the property, the defendant turned his back on Stafford to get a beer out of the trunk of the car. He claimed that is when Stafford hit him on the back with the gun and began beating him. A struggle ensued during which the defendant grabbed the gun, flipped it toward Stafford, and shot him in the back as Stafford tried to "haul ass" to the front of the car.
The defendant claimed that Stafford fell and then entered the driver's side of the car, which he tried to start to back up over the defendant who was on the ground behind it. The defendant stated that he staggered to the car door with the gun in his hand. They struggled over control of the gun and the car until the defendant got the keys out of the ignition and threw them on the ground. He claims that Stafford "cold cocked" him on the forehead knocking him to the ground. He heard Stafford trying to cock the gun but nothing happened. The defendant opened his eyes and saw Stafford running to the trailer where he broke through the door. The defendant followed Stafford to the trailer. He peeped through a window and even opened the door, but he did not see Stafford inside. He went back to the car where he saw the keys on the ground, a cell phone and shotgun shells. He claimed that he then passed out.
Photographs taken of the defendant at the time of his arrest show some bruises and scabbed wounds alleged to be bite marks on his arms, but no visible injury to his back. The investigation recovered no beer from the trunk of the car and found no shell casings in the car or on the ground.
Stafford, a former teacher and now a used car dealer, knew the defendant. Stafford testified that the defendant had called him around September 21, 2006, to borrow $200. Harris came to Stafford's house for the money and ended up borrowing $250. He said he would pay the money back the next day. Instead, the defendant called with an offer to sell Stafford a piece of property at a good deal. The defendant told Stafford that he would sell it for $3,000, even though his mother had paid $6,000 for the property.
On Saturday, September 23, 2006, Harris met Stafford at his home to drive him to the property. Stafford testified that Harris drove to the back of the property by an old shed and parked. He told him to "hold on" while he walked to the trailer on the property to talk to a man about removing some lumber. When he returned *236 to the car about five minutes later, he went to the trunk and took out a sawed-off shotgun. The defendant asked Stafford if he minded him shooting the gun and offered Stafford the opportunity to "bust off the first round." Stafford declined. The defendant then told Stafford, who had commented on the smooth ride, that he could drive the car. Stafford agreed and began walking toward the driver's side door when the defendant shot him in the back. Stafford testified that he was knocked to the ground by the impact. He rolled over and asked "What's going on?" As he was trying to reload the gun, the defendant responded, "You fixing to die." Stafford got out his cell phone and tried to take a picture and call 9-1-1. However, the defendant grabbed the phone, and Stafford grabbed for the gun as they began struggling. Stafford testified that he managed to get into the driver's seat of the car and start the ignition, but the defendant pulled the door open and the men began hitting and biting each other. Once the defendant grabbed the keys, he got out of the car and "kind of shook off the licks." He threw the keys down and came back toward the car door. Instead of trying to hold the door closed, Stafford kicked the door into the defendant, knocking him to the ground.
Stafford then ran toward the trailer and broke through the door to get inside. Stafford testified that he tried looking for a phone but was exhausted and losing a lot of blood. He rested until he could crawl to the door, by which time the officers were on the scene. Stafford testified that he never had total control of the gun and that he did not hit the defendant on the back with the gun.
Kendrick Brown and Nerita Loud were both in the trailer when the incident occurred and confirmed that the defendant had come to the door to talk about moving some things off the property. Neither witnessed the shooting that occurred afterward.
A jury convicted the defendant as charged of attempted second degree murder. His motion for a new trial was denied. The trial court sentenced him to 15 years of imprisonment at hard labor without benefits. This appeal followed.

DISCUSSION

First Assignment of Error
The defendant contends that the verdict is contrary to the law and the evidence. He claims that the unbiased testimony of Darnell Arrington and Nerita Loud supports his claim of self-defense. This same issue was raised in the motion for new trial, which was denied. The defendant's argument challenges the sufficiency of the evidence.
Review of a sufficiency of the evidence claim asks whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This standard, which is embodied in La. C. Cr. P. art. 821, does not provide this court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Dotie, 43,819 (La.App. 2d Cir.1/14/09), 1 So.3d 833. We do not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
Rather, a reviewing court gives great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App. 2d Cir.2/25/09), 3 So.3d 685; State v. Hill, 42,025 (La.App. 2d Cir.5/9/07), 956 So.2d 758, writ denied, *237 XXXX-XXXX (La.12/14/07), 970 So.2d 529. In the absence of internal contradiction or irreconcilable conflict with physical evidence one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App. 2d Cir.2/13/08), 975 So.2d 753.
To prove attempted second degree murder, the state must establish, beyond a reasonable doubt, that the defendant had the specific intent to kill a human being and that he committed an overt act in furtherance of that goal. La. R.S. 14:27 and La. R.S. 14:30.1; State v. Bishop, 2001-2548 (La.1/14/03), 835 So.2d 434. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); State v. Allen, 41,548 (La.App. 2d Cir.11/15/06), 942 So.2d 1244, writ denied, XXXX-XXXX (La.12/07/07), 969 So.2d 619. The trier of fact determines whether the requisite intent is present. Hill, supra.
The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Dooley, 38,763 (La.App. 2d Cir.9/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.2/18/05), 896 So.2d 30; State v. Brooks, 36,855 (La.App. 2d Cir.3/05/03), 839 So.2d 1075, writ denied, XXXX-XXXX (La.11/07/03), 857 So.2d 517.
Viewing the evidence, as directed by Jackson, supra, and La. C. Cr. P. art. 821, in the light most favorable to the state, we find it sufficient for a rational trier of fact to have found the essential elements of attempted second degree murder proven beyond a reasonable doubt. The jury was presented with two conflicting versions of the incident from the defendant and the victim. It is not for this court to substitute its own appreciation of the evidence for that of the trier of fact, whose job it is to assess witness credibility and weigh the evidence. The jury's verdict indicates that it believed Stafford's version of events, which was corroborated by the physical evidence, and found the defendant's story to be incredible. The evidence establishes that the defendant shot Stafford in the back at close range with a sawed-off shotgun. He told Stafford that he was "fixing to die." He prevented Stafford from leaving in the vehicle or calling for help, and he pursued him as he fled to the trailer. He apparently hid the weapon on the top of the shed. The circumstances of this offense are sufficient to support a finding of specific intent to kill as required to prove attempted second degree murder.
Contrary to the defendant's argument, neither the testimony of Nerita Loud nor Darnell Arrington supports his claim of self-defense. Neither woman witnessed the shooting. Loud testified that she was in the trailer watching movies with her boyfriend, Kendrick Brown, when the defendant knocked on the door to tell them about moving some things off the property. Loud also testified that she was looking out the windows and saw Stafford sitting on the trunk of the car down a "little ways" from the trailer. While speaking to Darnell Arrington on the phone, Loud told her that "it looked like they was about to fight or something down there." However, she did not hear any argument or fighting. Loud did hear what she thought was a gunshot. She looked out the window again and saw Stafford running toward the trailer. She and Brown then ran out the back door.
Though Arrington testified that Loud told her the two men were fighting and that she heard a gunshot, Arrington was not present and did not witness the incident. Moreover, Loud, who was present and watching the two men through the windows of the trailer, did not testify that *238 she saw them fighting; she testified only that it looked like they were about to fight.
We find no merit to the defendant's claim that the guilty verdict was contrary to the law and evidence. The testimony provided by Loud and Arrington, neither of whom witnessed the shooting, does not support his claim of self-defense. The defendant's outlandish story could have been easily discredited by a rational trier of fact. Accordingly, we find no merit to this assignment of error.

Second and Third Assignments of Error
In his second assignment of error, the defendant contends that the trial court gave an incorrect definition of attempted second degree murder by including "intent to cause great bodily harm." He asserts that the erroneous definition of attempted second degree murder was also reiterated by the state in its opening statement and closing argument. In his third assignment of error, he alleges an ineffective assistance of counsel claim due to defense counsel's failure to object to the improper instruction.
An attempted second degree murder requires that the defendant possess the specific intent to kill and that he commit an overt act tending toward the accomplishment of that goal. La. R.S. 14:27; La. R.S. 14:30.1; State v. Harris, 26,269 (La.App. 2d Cir.9/21/94), 643 So.2d 779, writ denied, 94-2607 (La.2/17/95), 650 So.2d 251. See also State v. Butler, 322 So.2d 189 (La.1975). An intent to inflict great bodily harm is not an element of the crime. Harris, supra.
In instructing the jury on the elements of the crime, the trial court read from the definition of attempt set forth in La. R.S. 14:27, and then read from the definition of second degree murder set forth in La. R.S. 14:30.1(1), which includes the killing of a human being where the offender has specific intent to kill or to inflict great bodily harm. The trial court then gave the following instruction:
Thus, in order to convict the defendant of attempted second degree murder, you must find (1) that the defendant had specific intent to commit the crime of second degree murder; and (2) that the defendant did an act for the purpose of and tending directly toward the commission of the crime of second degree murder.
Though the trial court did not specifically instruct the jury that attempted second degree could be found where there is specific intent to commit great bodily harm, the instruction had the effect of including that element in the definition of attempted second degree murder.[1] Similar instructions have been recognized as erroneous in State v. Hongo, 96-2060 (La.12/02/97), 706 So.2d 419, and State v. Harris, supra, both cases addressing post-conviction relief claims.
The record shows that the trial court's jury instructions were clearly erroneous. However, the defense made no objection to preserve the issue for appellate review. An irregularity or error cannot be availed of after the verdict unless it was objected to at the time of occurrence. *239 La. C. Cr. P. art. 841; State v. Hamilton, 594 So.2d 1376 (La.App. 2d Cir.1992). See State v. Belgard, 410 So.2d 720 (La.1982) and State v. Wilson, 28,403 (La.App. 2d Cir.8/21/96), 679 So.2d 963.
We note that an exception to the contemporaneous objection rule was made in State v. Williamson, 389 So.2d 1328 (La. 1980), where a defendant's conviction for second degree murder was reversed due to erroneous jury instructions on the elements of first and second degree murder and on responsive verdicts. The law pertaining to first and second degree murder had changed shortly before the offense, but the trial court, the prosecutor, and the defense counsel did not realize that the new law applied. The jury's verdict under the erroneous instructions was not supported by the evidence, but it would have been a valid verdict under the correct law. Citing fairness, the court opted to entertain the defendant's complaint on appeal even though the issue had not been preserved by an objection.
While Williamson, supra, involved wholly incorrect instructions, here the instructions included the correct elements but also included by reference the alternative incorrect element of intent to cause great bodily harm. The conviction obtained in response to the improper instructions in Williamson, supra, was not supported by the evidence. Here, the defendant's conviction is supported by evidence sufficient to establish that he had the specific intent to kill, and the jury was instructed on that element of the crime.
Based on these distinctions, we are not compelled to apply the Williamson exception to consider matters not preserved for review on appeal. In addressing a similar claim of improper jury instruction raised in a post-conviction relief application, the supreme court made the following observation regarding appellate review of such claims urged on appeal without an objection having been made:
Although this case is before us via post-conviction proceedings because of trial counsel's failure to object, we note that because we find that the instant error is not structural, it necessarily is not of such significance as to violate fundamental requirements of due process, See State v. Williamson, 389 So.2d 1328 (La.1980), and thus a defendant must make a contemporaneous objection in order to preserve the error for direct review. State v. Thomas, 427 So.2d 428, 435 (La.1982) (on rehearing) (limiting Williamson as it "should not be construed as authorizing appellate review of every alleged constitutional violation and erroneous jury instruction urged first on appeal without timely objection.")
State v. Hongo, supra, FN. 3.
In the absence of a contemporaneous objection to the improper instructions, the issue has not been preserved for appellate review. Moreover, the defendant's claim of ineffective assistance of counsel, which is also based on the improper jury instruction, is a matter more properly raised in an application for post-conviction relief in the trial court where there is the opportunity for a full evidentiary hearing under La. C. Cr. P. art. 930. See State ex rel. Bailey v. City of West Monroe, 418 So.2d 570 (La.1982); State v. Ellis, 42,520 (La.App. 2d Cir.9/26/07), 966 So.2d 139, writ denied, 07-2190 (La.4/4/08), 978 So.2d 325.
For these reasons, assignments of error two and three provide no basis for reversal of the defendant's conviction on appeal. His claims may be asserted in post-conviction relief proceedings if he desires to pursue them.

*240 CONCLUSION
For the reasons stated, the defendant's conviction for attempted second degree murder is affirmed.
AFFIRMED.
BROWN, Chief Judge, concurs for the reasons assigned by J. DREW.
DREW, Judge, concurs with written reasons.
DREW, J., concurring.
I write to concur with the result reached by the majority opinion, further writing here to note that since the jury apparently found the defendant an untruthful witness, and since the jury rejected defendant's claim of self-defense and other outlandish testimony, and since the jury found that defendant shot the victim in the back at close range with a sawed-off shotgun, while lacking lawful provocation, then there is no realistic chance that the confusing "intent" arguments and instructions made any difference whatsoever in the guilty verdict. Any reasonable juror would conclude that the defendant had the specific intent to kill when he pulled the trigger of the shotgun at close range and said: "You're going to die." In other words, the verdict was surely unattributable to any trial error.
APPLICATION FOR REHEARING
Before BROWN, STEWART, DREW, MOORE and LOLLEY, JJ.
Rehearing denied.
NOTES
[1] The record shows that the state gave an erroneous definition of the offense in its opening statement and closing argument. At the outset of trial, the state defined the elements of attempt and second degree murder then told the jury, "It was the fact that the defendant had the specific intent to kill or to inflict great bodily harm upon the victim that makes it Attempted Second Degree Murder." In closing, the state argued that it had to prove the defendant had the intent to kill or inflict great bodily harm and that the "[c]ircumstances tell you that he intended to kill him or inflict great bodily harm." However, there was no objection by defense counsel to these misstatements of the law.