PITMAN, J.
| defendant Melvin Randall Patterson was, charged with the attempted first degree murders of Bessie Jordan and her brother, Louis Grant, Jr. After a bench trial, he was found guilty of the responsive verdict of attempted second degree murder on each count and sentenced fo serve 30 years at hard labor on each count, to run concurrently, without benefit of probation, parole or suspension of sentence. Defendant appeals his convictions and sentences.[1] For the following reasons, we affirm his convictions and sentences.

FACTS

At' approximately 2:00 a.m. on July 29, 2012, Fred Jordan was hosting a birthday party for his wife, Bessie Jordan, at their home at 8503 Elmview Place, Shreveport, Caddo Parish, when Defendant showed up with a female friend. Defendant told the Jordans that he had-been invited by-Mrs. *742 Jordan’s uncle, Wayne Seymour, whom he asked to see. Mr. Jordan asked Defendant to leave because the party was winding down, and the two argued. Defendant made a telephone call and then he and his friend returned to them vehicle, where Defendant entered the driver’s seat and his friend got in the passenger seat. They drove a short distance,- turned around and drove back by the Jordans’ home. Gunfire erupted from the car and Mrs. Jordan and Mr. Grant sustained gunshot wounds. The Jordans and Mr. Grant identified Defendant as the shooter, and he was arrested and ^charged with two counts of attempted first degree murder in violation of La. R.S. 14:30.1 and 14.-27.[2]
Defendant waived his right to trial by jury. The parties appeared for trial on July 16, 2014, and the state offered a plea bargain agreement, which was rejected.
The bench trial began with testimony from' Mrs. Jordan that family and friends, including Mr. Grant, were at her home on July 29, 2012, to celebrate her birthday. She stated that Defendant walked up to her door and told her husband that he wanted to see Mr. Seymour. Her husband told Defendant that the party was over and asked him to leave. She further testified that she had seen Defendant before at her place of employment, Thrifty Liquor on Market Street, but she did not know him personally. Defendant was upset and fidgety while he was speaking to her husband, She stated that, after her husband refused to let Defendant see Mr. Seymour, Defendant and a young woman with him walked down the driveway and got into a silver. Dodge vehicle. The couple drove away,' but turned around and drove back by the house, and shots were fired.
Mrs. Jordan further testified that, when the shots were fired, she began to run away and was unaware at that time that she had been shot. She saw Mr. Grant lying on the floor, told others, to call 911 and then went back outside to- find her husband. It was at that time she realized she had also been shot-in the left buttock and the lower leg. She did not give any statements to police at her home. She was taken to the hospital and stayed 13for two days. Shortly thereafter, in early August, she had surgery to remove the bullet from her left leg. Mrs. Jordan was shown the lineup of suspects from which she had identified Defendant as the person who shot her and confirmed that she had made the identification during the investigation. She also identified Defendant in the courtroom as the person who shot her.
Mr. Grant testified that he followed his sister outside in front of the house, where Mr. Jordan and Defendant were' talking. He testified that he did not know’Defendant prior to the incident that night, but identified him in the courtroom as the same person to whom his brother-in-law was speaking, Mr. Grant’s testimony reiterated that of Mrs. Jordan that Defendant was “looking crazy” and fidgeting and asked to see Mr. Seymour. When Mr. Jordan insisted that he leave, Defendant got upset, pulled out a cell phone to call someone and then walked down the driveway with a young woman to a short silver car, like a Dodge or a Chrysler. Defendant got in on the driver’s side of the car and the woman got in on the passenger side.
Mr. Grant further testified that he saw Mr. Seymour approaching from the back yard. He yelled at Mr. Seymour, who stopped. He stated that, as he turned *743 back and was facing the street, he heard two shots and then saw the man in the silver vehicle firing at him. He was shot in the upper abdomen, but did not realize it until he ran into the house and tripped and fell. It was then that someone told him he had been shot, and he felt his chest hurting. Paramedics took him to the hospital, where he stayed for a few hours. He returned to the hospital five days later for surgery to remove the bullet. Mr. Grant further testified that he was interviewed by Det. Jerry |4Curtis, both at the hospital and some days later; . and he identified Defendant’s picture out of a photo lineup, The defense played the recorded interview, and his recorded statement to Det. Curtis confirmed that he did not see the first two shots fired before he turned back facing the street. At that point, there were multiple shots fired. He saw dirt moving from the direction of Defendant coming straight toward him, so he turned and ran.
Mr. Jordan’s testimony corroborated that of Mrs. Jordan and Mr. Grant.- He stated that he had been drinking, but was not drunk, and was emotional, distraught and angry over the shooting of his wife and brother-in-law. He further testified that the police restrained 'him from accompanying his wife to the hospital, which he did not understand, because he believed that she had life-threatening injuries. He got into a scuffle with officers and was handcuffed and placed in a squad car. He stated that he was able to see the shooter and witnessed Defendant fire the shots. The shooter was in his car, with the window down, gun in hand, firing the gun.
The defense played Mi1. Jordan’s 911. call and his recorded statement to Det. Curtis. In the 911 call, Mr. Jordan stated that “some niggas just shot up his house.” Mr. Jordan -explained that he used -the plural referring to Defendant and ■ the female with him. After'hearing his.statement to Dei. Curtis, Mr. Jordan-admitted that he said he did not actually see the gun itself, but saw .gunfire coming from Defendant.Sgt. Stephen Plunkett- of the Shreveport Police Department testified that, when he responded to the'911 call of shots fired,-he found a lot of ^people outside and inside the house, a woman sitting in a chair in the driveway was shot and another person inside the house was shot in the stomach. He stated that there were many people yelling and that fights broke out, so he did not interview anyone for - statements, but only questioned several- people to determine what had, happened... Recordings from Sgt. Plunkett’s , body microphone (“MVS”) were played. ,He testified, that a comment that “ ‘she’ was intoxicated from all that liquor,” referred to Mrs. Jordan. In another recording from his MVS, Sgt, Plunkett, was heard, explaining to other officers about the fights that broke out during the investigation of the shooting, that there was a-melee and that the people involved were drunk. It-was during this time period of the recording that Mr. Jordan was handcuffed and charged with hitting Ofc, ,Zach Johnson, a. charge later dismissed.
- The defense attempted to. introduce a recorded stateuient. from :Sgt. Plunkett’s MVS by an unknown female, made .some 15 to 25 minutes after the.shooting, under the excited utterance exception to the hearsay rule.[3] The state objected that the comment did not fall within the scope of the excited utterance exception under La. C.E. art. 803 because it was made too long after the shooting. The trial court listened to the statement,, in which an unknown *744 female voice states that the shooter drove by in a black car and then something flew past her arm, and stated that the exception was intended for statements made when the event occurs or immediately 1 ^thereafter. The statement at issue was made 15 to 25 minutes after the shooting event, so it ruled that the statement was inadmissible, but allowed the evidence to be offered as a proffer.
Defendant’s former cellmate, Ronnie Smith, testified that he first met Defendant at the Caddo Correctional Center in 2012, and then again when they were cellmates in 2014. Mr. Smith had prior convictions for malfeasance in office and felony theft and, at the time of this trial, was incarcerated on a charge of attempted first degree murder of his wife. Mr. Smith told his attorney that, while in jail, Defendant had confessed to the shootings. Mr. Smith’s attorney alerted the prosecutor and Mr. Smith gave a recorded statement to Det. Curtis. In that statement, he said that he and Defendant discussed their cases because both were charged with attempted murder. Defendant told him he went to a party, but some guy at the party named Fred told him he should have come earlier and told him to leave. Defendant said they got into an argument because he was looking for Mr. Seymour and he tried to call Mr. Seymour on his phone. Mr. Smith stated that Defendant admitted to the shooting, and said he had been drinking and did not like how Fred talked to him. He further stated that Defendant-did not brag about the shooting and was sorry about what had happened.
Mr. Smith further testified that he was not made any promises of leniency or offered any deals by the prosecutor in this case, who is also the prosecutor in his case. He stated that he just wanted to tell the truth. On cross-examination, the defense attempted to question him about the details 17of his pending charge for attempted second degree murder. The state objected that questioning about pending charges was limited to questions intended to reveal whether any deals were made in exchange for testimony, if the state had any leverage over the witness and if the witness had any expectation of leniency despite there being no express deals. The trial court ruled that questions about leverage or deals, or what the witness perceives the state told him, were proper, but prohibited questions specifically seeking facts about the witness’s pending charges because such questions would violate the witness’s right to remain silent. It stated that the witness did not waive his right to remain silent about his pending charges just by testifying in this matter. When the defense again attempted to question Mr. Smith about the facts of his pending attempted murder charge, his attorney objected, stating that Mr. Smith was invoking his Fifth Amendment right to remain silent and not incriminate himself.
The defense moved for mistrial on grounds that Mr. Smith’s assertion of his Fifth Amendment right to remain silent, after testifying that Defendant confessed to his own charges, violated Defendant’s rights of confrontation and cross-examination. The state objected to the motion. The trial court ruled that there were no grounds for mistrial and denied the motion. It also advised the defense attorney that he could question Mr. Smith about his motives for testifying and if he had a vendetta against Defendant, but could not ask any questions about the details of Mr. Smith’s pending charge. Mr. Smith stated that he was testifying because he believed that telling the truth was the right thing to do and that he had no deal with 18the state in exchange for his testimony. He denied looking at Defendants’s legal papers in his unlocked locker and said the prosecutor *745 clearly informed him that.he would receive nothing in. exchange for his testimony.
Det. Curtis testified and produced an envelope containing a projectile and ■ two expended cartridges, in addition to his report. The defense objected that the evidence and the report were never provided to it during discovery and it had no knowledge the evidence existed. The prosecutor stated that the evidence was severely damaged and would not be introduced into evidence. Because rules of discovery had been violated by the state’s failure to turn over the evidence, the trial court granted a recess to allow the defense to obtain an expert to determine if the evidence could be tested. An expert determined the cartridges. could be tested, and the trial court granted a continuance so-the testing could take place. After testing, two cartridge casings were found to -have been fired from one weapon; however, because no weapon was found, no further testing could be done.
Trial resumed on October 28, 2014, with testimony from Det. Curtis, who stated that he did not interview anyone at the scene. He interviewed Mrs. Jordan several days after the shooting, and she identified Defendant as the shooter from the photographic lineup. He stated that Mrs. Jordan told him that she did not see Defendant shooting, but saw gunfire erupting from the silver vehicle that she had seen Defendant get- into just minutes earlier. He stated that he also interviewed Mr. Jordan, who told him that he did not actually see the gun, but was looking at the car when the gunshots were fired.
|aThe state rested; and the defense made a motion for judgment of acquittal under La. C. Cr. P. art. 778, arguing that the state had failed to establish that Defendant was guilty beyond a reasonable doubt where there was no physical evidence connecting him to the shooting, the witnesses’ statements were inconsistent and none of the witnesses actually saw Defendant firing a gun. It. disputed the alleged confession by Defendant about which Mr. Smith testified, asserting that Mr. Smith fabricated the confession to curly favor with the ■ prosecutor in his own charge for attempted murder,. The motion was denied.- -
The defense called Cpl. Johnson of Shreveport' Police Department, who testified that he responded to the'shooting at the Jordan home and that the scene was chaotic, Mr. Jordan attacked him and spit in his face, and he had to handcuff Mr. Jordan. He further testified that he briefly spoke t'o both Mr. Grant and Mrs. Jordan, although Mrs. Jordan did not give a statement at the scene. - The defense pointed out to Cpl. Johnson that his report reflected that Mr. Grant stated -that he did not see anyone firing a weapon.
Sheron Horton, the Jordans’ next-door neighbor, testified that she was home in bed when she heard gunshots. She looked out her bedroom window and saw some young men jumping into a car. She could not tell how many men there were, but guessed there were three; She stated that, looking our her window, she saw a lot of people and many ears parked down the street, but did not see who shot the weapon.
' |; (Defendant elected to testify, and the trial court advised him that, in doing so, he would waive his right to remain silent. After he assured the court that he was not under the influence of drugs, alcohol or medications and was testifying voluntarily without threats or promises, he testified that he has three prior felony convictions, for second degree battery, attempted simple burglary and distribution of marijuana. He stated that his friend, Mr. Seymour, invited him to stop by the party, so he and his neighbor, Tersheka White, went to the *746 Jordans’ house. He stated that he did not have a gun. He introduced himself as “Frog,” which is his nickname, and that, when Mr. Jordan asked him to leave, he returned to his car. As he got in the car, he heard shots and almost left Ms. White. He did. not see who fired the shots and denied having fíred at or shot Mrs. Jordan or Mr. Grant. He further stated that his cellmate, Mr. Smith, was lying, that he never confessed to the shooting and that Mr. Smith obtained the information, about the incident by reading his legal papers kept in his cell locker. ,.
Defendant also testified that he did not Sell drugs to* Mr. Seymour or buy any drugs from him. He admitted that he had been drinking earlier, but denied having taken any drugs. He was asked to leave and he left, but he did not shoot at anyone. He stated that he had.no problem with the Jordans or Mr. Grant and believed- they were mistaken when they identified him as the shooter.
On rebuttal, Mrs. Jordan testified that she did not speak with Cpl. Johnson at the scene and that she only gave-, a statement to Det. Curtis several days.later.
| nPost-trial briefs were filed.' The trial court issued its ruling on November 19, 2014, and found Defendant guilty of two responsive verdicts of attempted second degree murder. It carefully reviewed the evidence and specified reasons’for its ruling. In addition to considering the testimony of the witnesses and the investigating officers, the trial court observed that the Jordans and Mr. Grant identified Defendant from a photographic lineup as the shooter and that Defendant admitted he was at the scene that night. The state filed a bill charging Defendant as a fourth felony habitual offender.
Defendant appeared for sentencing on March 23, 2015, and moved for a post-verdict judgment of acquittal on grounds that the evidence- was insufficient for a conviction. The motion was denied, and Defendant waived sentencing delays.
The trial court informed Defendant that the sentence range for attempted second degree murder is 10 to 50-years at hard labor, without benefit of probation, parole or suspension of sentence. Reviewing the sentencing guidelines under La. C. Cr. P. art. 894.1, it found that there was an undue risk that Defendant would commit a crime during a suspended sentence or probation, that Defendant was in need of correctional treatment in a custodial environment and that a lesser sentence would deprecate the seriousness of the crimes. It further found that Defendant manifested deliberate cruelty to the victims, who both suffered gunshot wounds; that he knowingly created a risk of death or great bodily harm to more than one person when he shot at- the home where a party was in progress; and that he 112used actual violence and a gun in the commission of the crimes, where he shot at people. , •
■The trial court found no mitigating circumstances in this matter.. Based on the facts- and circumstances of the case, it sentenced Defendant to 30 years at hard labor on each count, to be served without benefit of probation, parole or suspension of sentence, with , both counts to ran concurrently, and. ordered him to pay court costs. Defendant was notified that the offense was a crime of violence under La. R.S. 14:2(B). The defense’s objection to the sentences was noted. The state withdrew its habitual offender bill. Defendant did not file a motion to .reconsider .sentence. Defendant now appeals his convictions and sentences.

DISCUSSION

Sufficiency of the Evidence

Defendant argues that the evidence was insufficient to support convic *747 tions for attempted first degree murder.[4] Defendant argues that the testimony of the witnesses was so inconsistent with them previous statements to authorities that no rational trier of fact could have believed them beyond a reasonable doubt. While conceding that positive identification by even one witness is sufficient to support a conviction, Defendant contends that the testimony of the state’s three key witnesses at trial is riddled with inconsistencies and contradictions.
| isThe state argues that evidence is sufficient when a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, finds the essential elements of the crime proven béyond a reasonable doubt. The state argues that an appellate review of the evidence presented at trial would prove it was-’'sufficient to support the trial court’s ruling that Defendant was guilty of two counts of attempted second degree murder. *
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court must first determine the sufficiency of the evidence because the accused may be entitled to an acquittal, which would render other errors moot. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/02/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a . reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard of appellate review for a sufficiency of- the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, - any rational trier of fact could have found the essential elements of the crime proven beyond a, reasonable doubt. Jackson v. Virginia, supra; State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Crossley, 48,149 (La.App.2d Cir.6/26/13), 117 So.3d 585, writ denied, 13-1798 (La.2/14/14), 132 So.3d 410. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Crossley, supra; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913, cert. denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010); State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
Direct evidence provides proof of the existence of- a fact, for example, a witness’s testimony that he saw or heard-, something. State v. Lilly, 468 So.2d 1154 (La.1985). Circumstantial evidence provides proof of collateral facts and circumstances from which the existence of the *748 main fact may be inferred according to reason and common experience. Id. The tiier of fact is charged with weighing the credibility of this evidence and, on review, the same standard as in Jackson v. Virginia, supra, is applied, giving great deference to the fact finder’s conclusions. State v. Hill, 47,568 (La.App.2d Cir.9/26/12), 106 So.3d 617.
| ^When the state relies on circumstantial evidence to establish the existence of an essential element of a crime, the court must assume every fact that the evidence tends to prove, and the circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438; State v. Lilly, supra; State v. Robinson, 47,437 (La.App.2d Cir.11/14/12), 106 So.3d 1028, writ denied, 12-2658 (La.5/17/13), 117 So.3d 918.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Glover, 47,311 (La.App.2d Cir.10/10/12), 106 So.3d 129, writ denied, 12-2667 (La.5/24/13), 116 So.3d 659.
The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, cert. denied, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000); State v. Woodard, 47,286 (La.App.2d Cir.10/3/12), 107 So.3d 70, writ denied, 12-2371 (La.4/26/13), 112 So.3d 837.
Defendant was charged with attempted first degree murder under La. R.S. 14:30, which includes when the offender has a specific intent to kill or to inflict great bodily harm upon more than one person. Defendant was found guilty of attempted second degree murder under La. R.S. 14:30.1, |1flwhich includes the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm.
To prove attempted second degree murder, the state must establish, beyond a reasonable doubt, that the defendant had the specific intent to kill a human being and that he committed an overt act in furtherance of that goal. La. R.S. 14:27 and 14:30.1; State v. Tillman, 47,386 (La.App.2d Cir.8/8/12), 104 So.3d 480. The state must prove beyond a reasonable doubt that the defendant had the specific intent to kill, because proof of specific intent to inflict great bodily harm is insufficient for a conviction for attempted second degree murder. State v. Bishop, 01-2548 (La.1/14/03), 835 So.2d 434; State v. Murray, 49,418 (La.App.2d Cir.1/14/15), 161 So.3d 918.
Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent may be inferred from the circumstances of the offense and the defendant’s act of deliberately pointing a gún and firing it at a person. State v. Freeman, 45,127 (La.App.2d Cir.4/14/10), 34 So.3d 541, writ denied, 10-1043 (La.11/24/10), 50 So.3d 827. The trier of fact determines whether the requisite intent is present. State v. Harris, 44,613 (La.App.2d Cir.9/23/09) 22 So.3d 232, writ denied, 09-2528 (La.5/21/10), 36 So.3d 227. The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill. State v. Murray, supra; State v. Harris, supra.
*749 |17A review of the record shows that all three of the witnesses present at the birthday party testified that Defendant was the person who came to the party in the early hours of the morning, asked to see Mr. Seymour and was refused entry to the party by Mr. Jordan. All three witnesses agree that Defendant and his female friend got into a silver car, turned the car around and then gunshots were fired from the driver’s side of the automobile at the people gathered in the driveway of the Jor-dans’ home. Mrs. Jordan and Mr. Grant were shot and taken to the hospital, where each eventually had surgery to remove bullets. All three witnesses identified Defendant from the photographic lineup as the person who got into the silver car and who was firing shots from that vehicle.
Defendant’s specific intent to kill can be inferred from the circumstances and by his actions. Multiple witnesses testified that he was acting strangely and that he insisted on seeing Mr. Seymour, despite Mr. Jordan’s repeated statements that he had come too late and the party was over. Defendant refused to listen and continued to argue. He was angry about being denied entry to the party, even calling someone to complain about it. When he finally left, he immediately came back and repeatedly fired a. gun toward the house where he could see there were people standing outside and he knew there were more people inside. The simple act of pointing a gun at these people and firing the gun at them shows specific intent to kill.
| ^Considering these facts in a light most favorable to the prosecution, any rational trier of fact could conclude that Defendant had specific intent to kill Mrs. Jordan and Mr. Grant. This assignment of error is without merit.

Inadmissibility of statement on Sgt, Plunkett’s MVS

Defendant argues that the trial court erred in refusing to admit into evidence, as exceptions to the hearsay rule, certain statements made “15 to 20 minutes” after the incident at the party by unidentified persons and recorded on Sgt. Plunkett’s MVS. Defendant contends that these statements were excited utterances under La. C.E. art. 803(2) and are not excluded by the hearsay rule, regardless of the declarant’s availability. Defendant also contends that the statements at issue call into question Mrs. Jordan’s credibility as a witness as well as the identity of the shooter. Defendant specifically wanted to have the'court consider the statements of an unknown male’s voice stating that the shooter was driving a vehicle with purple tinted windows and another male stating, “when they first pulled up. They stopped right about here, busted in the air about four or five times ... and then they started pointing.” Defendant also asked that the statement by an unknown female wiL ness, who describes the shooter’s car as being black, be admitted.
The state argues that the audio quality of the statement by the unknown female, about a black car was of poor quality and not entirely audible, it did not reflect an “excited tone” and it was made at least. 20 minutes after the shooting incident occurred. It asserts that the timing, context and tone of the statement indicate that it was not an excited utterance.
119Hearsay is a statement, other- than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). Hearsay is inadmissible except as provided by law. La. C.E. art. 802. One exception allows that, even when the declarant is available as a witness, an excited utterance *750 by the declarant is not excluded as hearsay. La: C.E. art. 803(2). An excited utterance is a statement by the declarant, about a startling event or condition, made while under the stress or excitement caused by that event or condition. Id. The statement must be a spontaneous reaction to the event or condition, which must have been so startling as to render the declar-ant’s .normal reflective thought process inoperative. State v. Richardson, 46,360 (La.App.2d Cir.6/22/11), 71 So.3d 492. The time that lapsed between the event and the statement is the most important factor in determining whether the statement was niade under the stress of the event, as the court considers • whether the declarant could have calmed down enough during that time for reflective thought to be restored. Id. The statement must “be close enough in time to be the result of a spontaneous reaction to the event and not the result of reflective thought.” State v. Griffin, 45,045 (La.App.2d Cir.1/27/10), 30 So.3d 1039, writ denied, 10-447 (La.9/17/10), 45 So.3d 1043.
Statements that are self-serving, statements made in response to an inquiry and ■ statements that go beyond a description of the event to past or future facts are all facts that may indicate a statement was the result of reflective thought and so was not an excited .utterance. Griffin, supra. ^J^Proof that; between the event and the statement, the declarant performed tasks that required a reflective thought process also may indicate the statement was not an excited utterance. Id. A gunshot wound suffered by the declarant is a startling event that may prevent sufficient time for the declarant to become calm and regain reflective thought, and an outburst by a wounded declarant to emergency personnel-or law enforcement officers may be a spontaneous statement and not a narrative or reflective process. State v. Blanche, 47,014 (La.App.2d Cir.4/25/12), 92 So.3d 508. Admission of even hearsay testimony is harmless error where the effect is merely cumulative or corroborative of other testimony adduced at trial. Id.
Recordings of Sgt. Plunkett’s MVS reveal that the scene was chaotic and the officers struggled to maintain control of the crowd, who were understandably emotional, upset and fearful of what had just happened. The span of time from when the shooting occurred and when the statements were made is not exact and seems to fall somewhere'between 20 and 30 minutes after the shooting and were made in response to the officer’s inquiry about the events. The speakers’ tone could be construed as excited, but in light of the chaotic scene and the outbreak of fights among the party goers, it cannot be determined if the excited tone was from the shooting or the people fighting among themselves and with the police officers. Unlike the declar-. ant in Blanche, supra, the speakers were not suffering from a gunshot wound, which might impede them from regaining their reflective thought after the shooting.
J^None of the recordings, and none of the witness testimony, clarifies who else was outside when the shooting occurred. There is no indication of the location of the unknown speakers who. commented on the color of the car and whether those persons had been drinking and how much. There is no evidence to indicate where any of the speakers were when the incident occurred, whether they were outside in the front yard, inside the house looking through a window or coming around the side of the house from the back yard.
Defendant’s proffer of the evidence is insufficient to support his claims that the statements fell within the excited utterance exception to the hearsay rule. The only circumstance relevant to such an in *751 quiry referred to the time of the alleged statements, 15 to 20 minutes after the crime. No information was provided concerning the actions of the declarants between the time of the crime and the time of these statements. Defendant failed to meet his burden in establishing that the statements fell within the exception. Therefore, this assignment of error is ■without merit.

Prohibition from cross-examination of former cellmate Smith

• Defendant argues that the trial court erred in prohibiting him from cross-examining his former cellmate, Mr. Smith, concerning Mr. Smith’s pending charge for attempted murder. Defendant claims that the trial court denied him the opportunity to establish Mr. Smith’s bias or interest in testifying against him after Mr. Smith exercised his Fifth Amendment right to remain silent.
|aaThe state argues that, contrary to Defendant’s claim, the trial court did allow him to extensively cross-examine Smith, pointing out that Defendant asked Mr. Smith if he had received a deal with the state regarding the prosecution of the crime for which he had been charged, and Mr. Smith responded negatively. Defendant also asked Mr, Smith if he was testifying in the hope that he would derive some benefit from the testimony, and Mr. Smith answered negatively. Mr. Smith even denied a third time that he had any expectation of his case being dismissed as a result of his testimony in Defendant’s case. Therefore, the state argues, the record reflects that Defendant was not denied the right to.cross-examine the witness as to his potential bias or prejudice. The state also argues that only offenses for which the witness has been convicted are admissible upon .the issue of credibility, and no inquiry is permitted into matters for which there has only been an arrest, warrant, | ¡^indictment,. prosecution or acquittal. More-importantly, the state argues that each criminal defendant enjoys a constitutional right, against self-incrimination.
Under the Sixth Amendment and La. Const. Art. I, § 16, an accused in a criminal prosecution -is guaranteed the right- to confront and cross-examine the witnesses against him. La. C.E. art. 607(D)(1) states that a party may attack the credibility of a witness by introducing extrinsic evidence to show the witness’s bias or interest. La. C.E. art. 609.1, states that, in a criminal case, only offenses for. which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, issuance of an arrest warrant, an indictment, prosecution or acquittal. However, a witness’s bias or interest regarding arrests, pending criminal charges and the prospect of prosecution may arise even when there are no agreements between the-witness-and the state. State v. Burbank, 02-1407 (La.4/23/04), 872 So.2d 1049.
Confrontation errors are subject to harmless-error analysis. Burbank, supra. An error is harmless beyond a reasonable doubt .if the verdict was surely unattributable to Such-error. State v. Robertson, 06-1537 (La.1/16/08), 988 So.2d 166.
Defendant was allowed to confront and cross-examine Mr. Smith about any leverage the prosecutor might'have or any hope for leniency that he might' have -held regarding his testimony, and the defense’s questions exposed these facts for the fact finder’s consideration ’ in weighing the credibility of hie testimony^ Throughout repeated questioning, Mr. Smith emphatically denied any deal - dr expectation of benefit and insisted that he merely wanted to tell the truth. Details of his pending charge were not relevant to Defendant’s *752 case, and any inquiries into the details of his charge would have violated his rights since he invoked his right to remain silent. Defendant fails to show that he was deprived of his right to cross-examine the witness' for bias or interest and fails to show that the trial court erred in restricting Defendant’s inquiries into the witness’s pending felony charge. This assignment or error is without merit.
| ^CONCLUSION
For the foregoing reasons, we affirm the convictions and sentences of Defendant, Melvin Randall Patterson.
AFFIRMED.

. Defendant’s motion for appeal indicates he is appealing his convictions and sentences, but no assignment of error or argument in brief was filed with regard to the sentences. ■For this reason, there is no discussion concerning the sentences imposed.

. Although the bill of information states the date of occurrence was July 17, 2012, at trial, the date was given as July 29, 2012.

. The statement was recorded by Sgt. Plunk-ett's MVS and is found on Defense Exhibit No. 6, at 2 hours, 27 minutes, 59 seconds. Defendant has assigned as error the trial court’s failure to allow this evidence to be admitted.

. The trial court found Defendant guilty of two counts 'of attempted second degree murder, which were responsive verdicts-to the charges of attempted first degree murder. Both Defendant and the state mistakenly refer in briefs to the rulings as verdicts of guilty of two-counts of first degree murder.