Judgment rendered March 3, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,827-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

DAVID ARTHUR SMITH                          Appellant

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 14-F3155

Honorable Marcus Lamar Hunter, Judge

* * * * *

ROBERT S. NOEL, II                          Counsel for Appellant

DAVID A. SMITH                               Pro Se

ROBERT S. TEW                               Counsel for Appellee
District Attorney

SHIRLEY M. WILSON DAVIS
Assistant District Attorney

* * * * *

Before MOORE, STEPHENS, and THOMPSON, JJ.

STEPHENS, J., dissents with written reasons.

**THOMPSON, J.**

In this criminal appeal, the defendant, David Arthur Smith, was convicted at a bench trial of two counts of attempted second degree murder, and one count each of aggravated battery, armed robbery, second degree robbery, carjacking, and aggravated criminal damage to property. Mr. Smith now appeals: (1) his conviction on the two attempted second degree murder charges alleging the absence of requisite specific intent to kill; (2) all convictions asserting he should have been found not guilty by reason of insanity; and (3) the sentences imposed as being unconstitutionally harsh under the circumstances. For the reasons more fully detailed below, we affirm in part, vacate in part, and remand in part.

## FACTS

On August 6, 2019, David Arthur Smith was charged by amended bill of information with three counts of attempted second degree murder and one count each of second degree robbery, carjacking, aggravated criminal damage to property, and armed robbery. The events giving rise to the charges against Smith were relayed to the court from the eyewitness perspectives of the three victims. These accounts of the events of that fateful day in November of 2014 comprise part of the record in the form of police reports, statements, testimony, and evidence. Each victim had a slightly different vantage point from which they witnessed and experienced the events as they unfolded.

A bench trial was held on August 27, 2019, at which Smith was alleged to have attacked 76-year-old Charles Winters ("Winters"), then attacked and drove a vehicle over 72-year-old Michael Urban, III ("Mr. Urban") when he attempted to intervene to assist Winters, and attempted to

run down 74-year-old Brenda Urban ("Mrs. Urban") in her yard.  In the process, Smith was alleged to have stolen car keys from Winters, a pistol, a watch, and vehicle from Mr. Urban, and caused damage to the Urban vehicle and home when he ran the vehicle in to it.  The facts presented at the trial are detailed below.

On November 2, 2014, Winters noticed an unfamiliar person on the street in his neighborhood and went to the house of his across the street neighbors, Mr. and Mrs. Urban, and asked them to call the sheriff's department because he had seen an "undesirable" in their neighborhood.  Mrs. Urban stated that she saw a man, later identified as Smith, walking down the road toward Winters' home.  Winters returned home, and Mrs. Urban told her husband to call the police to make them aware of Smith's presence in the neighborhood.  Simultaneously with her instructions to Mr. Urban, Mrs. Urban, while looking out her front window, saw Smith run into Winters' carport, knock Winters to the ground, and begin to beat him.  Sadly, Winters passed away from reportedly unrelated medical issues during the five-year period between the attack and the date of trial, but his comments were preserved in the form of police investigative reports, which were admitted into evidence.

Winters described to police that he pulled into his carport and was walking to his front door when he noticed Smith in his yard. Smith immediately charged at him.  Smith attacked Winters, grabbing him by his throat, throwing him on the concrete carport slab, and began to repeatedly strike his head against the concrete.  Winters had the keys to his vehicle in his hand, and at some point, Smith pried those keys out of his hand.  The keys were later recovered from Smith's clothing, despite Smith denying

2

having possession of the keys.  Winters told police that during the attack, Smith told him that he was Jesus and he was going to kill him.  The record indicates Smith undertook serious efforts to accomplish his stated objective.  With his head slammed against the concrete slab several times, Winters eventually lost consciousness.  Smith continued to beat Winters' head against the concrete until Mr. Urban arrived to intervene.

Mrs. Urban told police and testified that she told her husband that Mr. Winters was being attacked and that Mr. Urban grabbed his pistol, got in Mrs. Urban's black Ford Explorer, and drove across the street and up to Winters' residence, in an attempt to intervene in the attack on Winters.  Mr. Urban told police and testified that he armed himself with his Ruger .41 revolver, drove to Winters' home, and that upon arrival at Winters' carport, he observed Smith hitting Winters' head repeatedly against the concrete.  Mr. Urban believed Winters might already be dead from the attack when he arrived.

After honking the horn in an attempt to distract Smith, Mr. Urban exited his vehicle with his pistol in hand, pointed it at Smith, and told him to lie down.  Mr. Urban testified that Smith told him "you are not going to shoot me," "I'm going to kill you," and began running the short distance toward him.  Mr. Urban said he pulled the trigger but that the gun did not fire.  It was later discovered that although the revolver could hold six bullets, there were only five bullets in the cylinder.  An empty sixth chamber could explain why the pistol did not fire when Mr. Urban pulled the trigger.

Smith then violently pushed Mr. Urban against a tree, knocking the gun out of his hand, and began to beat Mr. Urban.  As the two struggled on the ground, Smith took Mr. Urban's gun, pointed it at Mr. Urban's head, and

3

fired, just barely missing him and striking the ground immediately next to him, causing pieces of dirt and gravel to be blown into his ear. Mr. Urban told police that Smith then placed the pistol against his forehead and pulled the trigger, but the gun misfired. It was later discovered that of the five bullets in the gun, one had been fired and one had an indention from the firing pin, which indicated the trigger had been pulled but that the bullet malfunctioned and misfired. That misfired bullet could explain why, when Smith put the gun pointblank against Mr. Urban's forehead and pulled the trigger, it did not fire and kill him instantly.

Smith then continued to pistol-whip Mr. Urban, kicked him, and dragged him up and down the gravel driveway. While Mr. Urban was being dragged, his clothes were torn off. At some point during this altercation and while armed with the pistol, Smith removed Mr. Urban's watch, which was later recovered from Smith's clothing, despite Smith denying he took the watch and alleging he was framed for the theft by police. Smith dragged Mr. Urban nearer to the vehicle, and while Mr. Urban was still on the ground, Smith got into the vehicle and drove over him. After running over Mr. Urban, Smith put the vehicle in reverse and drove over him again. Mr. Urban testified that during this time he was conscious but unable to move.

Mr. Winters testified that at some point, he regained consciousness in the carport and saw an injured Mr. Urban lying in his yard. Mr. Winters retrieved a gun and waited with his vehicle near Mr. Urban for the police to arrive.

During the time when Mr. Urban went to Mr. Winters' house, Mrs. Urban was at her home across the street calling the police. She told police and testified that she heard a gunshot and observed her husband lying still on

4

the ground by a tree.  When Mrs. Urban started to run toward her husband, she saw Smith driving her vehicle through Winters' yard, across the street, and into her yard towards her.  Mrs. Urban testified that she turned and ran toward the house as Smith approached her in the vehicle.  She was near the edge of the garage when Smith finally caught up to her and hit her with the vehicle, knocking her into the garage.  The vehicle also hit a portion of the home and garage causing significant damage and likely preventing greater injury to Mrs. Urban.  Mrs. Urban managed to get up, ran inside her home, and locked the door.  Mrs. Urban was on the phone with the police dispatcher the entire time.  Smith abandoned the vehicle and fled into the woods.

After a significant struggle with law enforcement, Smith was apprehended at his campsite close to the location of this incident.  The key to Winters' vehicle and Mr. Urban's watch were found in Smith's pockets after his arrest and photographs were taken, which were admitted into evidence at trial.  Mr. Urban's pistol was found inside the Urban vehicle, where Smith apparently abandoned it when he fled.

Mr. and Mrs. Urban and Winters were all transported to the hospital after this incident.  Mr. Urban spent 8 months in the hospital and additional time recovering at home after the beating, gunshot attempt, and being run over, twice, by Smith.  He has residual trouble hearing.  He underwent a left hip partial replacement, a right knee partial replacement, his shoulder was reconstructed, he had colon surgery, his gallbladder was removed, he required a kidney transplant, and he had lung surgery.  Mrs. Urban had scrapes on her knees and backside.  Mr. Winters was hospitalized and in a great deal of pain.

On January 12, 2015, Smith was arraigned and entered pleas of not guilty to all charges. On February 25, 2016, Smith's trial counsel filed a motion for the appointment of a sanity commission. The sanity commission consisted of Dr. Pinkston and Dr. Charles Vosburg, and it was determined that Smith was competent to proceed with trial. On March 27, 2018, Smith changed his pleas from not guilty to not guilty by reason of insanity.

During his interview with Smith, Dr. Pinkston discovered that Smith had been diagnosed with a severe case of Bipolar I disorder and had a history of delusions and substance abuse. Smith reported he had not been taking his prescribed medication for roughly one year prior to this incident. Dr. Pinkston explained that when Smith did not take his medication, his delusions would recur. Smith reportedly first showed signs of some variant of mental illness in 2007 or 2008 and had been hospitalized at least three times for treatment prior to this incident.

Dr. Pinkston concluded that Smith was capable of distinguishing between right and wrong at the time of the offense. Dr. Pinkston came to this conclusion because Smith was able to relay a linear story from before the crime occurred and most other aspects of the crime. Dr. Pinkston found that Smith had suffered from documented delusions and psychosis since 2007 or 2008 and abused substances, including stimulants, cocaine, amphetamines, methamphetamines, and cannabis. Dr. Pinkston further testified that while delusions may interfere with functioning, they do not automatically make one insane. Dr. Pinkston stated that while the use of drugs could have affected Smith's mental capacity, delusions from drugs do not necessarily cause a person to be violent.

6

The defense called Dr. Roy Ragsdale and Dr. Charles Vosburg as expert witnesses. Dr. Ragsdale is a psychiatrist who intermittently treated Smith from 2008 to 2014, for a total of 12 times. He diagnosed Smith as severely bipolar, with a substance abuse problem, and a history of delusions when unmedicated. On cross-examination, Dr. Ragsdale agreed that a person who has a delusion may understand that their actions are against the law.

Dr. Charles Vosburg, a forensic psychologist, along with psychiatrist Clay Kelly, also examined Smith as required by the court on June 2, 2017. Drs. Vosburg and Kelly concluded that Smith was competent to proceed to trial due to his stabilizing medication. Dr. Vosburg testified that he believed Smith to be insane, finding that he suffered from many delusions, specifically that he was the antichrist and could control animals and insects. Dr. Vosburg noted that Smith did not provide clear details about the incident, but rather, simply made delusional statements. He testified that if a person acts on his or her delusions, then there is no clear criminal intent.

Smith testified on his own behalf at trial, acknowledging that he had struggled with mental illness for years and had been hospitalized several times. He further admitted that he had been prescribed medication but did not like taking it. He was not medicated on the date of the altercation.

On the day of the incident, Smith testified that he intended to walk on the nearby railroad tracks with two of his four dogs. He had left his two smaller dogs in a car because he feared for their safety. Smith testified the dogs got away from him when Mr. Winters approached him and told Smith to leave his yard. Smith testified that he and Mr. Winters got into an altercation and that his intention in beating Mr. Winters' head against the

ground was to make him "pass out." Smith testifid that he did not intend to kill Winters, Mrs. Urban, or Mr. Urban. The record provides no insight as to exactly when Smith would have been able to distinguish between violently repeatedly striking Winters' head against the concrete floor of the carport sufficient to making him pass out versus killing him.

After Winters was unconscious, Smith testified that Mr. Urban approached him and attempted to fire his weapon twice. Smith ran toward Mr. Urban, took his gun, hit him, and punched him. Smith denied that he ever dragged Mr. Urban but did admit that he put a gun to Mr. Urban's head. Smith testified:

> I put the gun to his head and then moved it aside and shot the gun. I was seeing really if it was going to shoot because it had clicked twice. I thought maybe it had dud shells or maybe it wasn't even loaded. But I put it beside his ear so it'd give him a scare is what I wanted to do because he had tried to kill me

According to Smith, after he shot at Mr. Urban, he was afraid for his life, so he tried to get away. He testified that he did not recall running over Mr. Urban, either time. Smith testified that he got into Mr. Urban's vehicle and was startled, which caused him to hit the gas, lose control of the vehicle, and hit the house across the street. He testified that he never intended to hit Mrs. Urban with the car. He stated that he headed across the street because he wanted to retrieve his dogs and leave the area. After hitting the house, Smith testified that he left the vehicle and returned to the railroad tracks to wait for the police to arrive. Smith denied having taken the keys from Winters or the watch from Mr. Urban, alleging he was being framed for those charges, despite the police photographs introduced into evidence showing those items recovered from Smith's clothing.

8

The trial court found Smith guilty of two counts of attempted second degree murder as to Winters and Mr. Urban, one count of aggravated battery as to Mrs. Urban, and one count each of second degree robbery, carjacking, aggravated criminal damage to property, and armed robbery. In accordance with La. C. Cr. P. art. 894.1, the trial court found that the defendant was in need of correctional treatment or custodial environment that could be provided most effectively by his commitment to an institution, that a lesser sentence would deprecate the seriousness of the defendant's crime, that the defendant knew the victims were vulnerable, that the defendant created a risk of death or great bodily harm to more than one person, that the offense resulted in significant permanent injury, that the defendant used a dangerous weapon in the commission of this offense, and that the offense involved multiple victims.

Smith was sentenced to 30 years on each count of attempted second degree murder, 5 years at hard labor for aggravated battery, 20 years for second degree robbery, 10 years at hard labor without benefit of probation, parole, or suspension of sentence for carjacking, 5 years at hard labor, suspended, and 5 years of probation for aggravated criminal damage to property, and 30 years for armed robbery, plus an additional 5 years for the firearm enhancement. Smith was ordered to pay $25,000 in restitution in connection with the criminal damage to property charge related to the Urbans. The sentences were ordered to be served concurrently, except the 5-year firearm enhancement, which was ordered to be served consecutively. At the conclusion of the trial, Smith's trial counsel filed a motion to withdraw and objected to the sentence, but did not file any other motions. Smith did not file a motion to reconsider sentence. Smith's appellate

counsel filed a motion for an out-of-time appeal two months later, which was granted.

## DISCUSSION

First Assignment of Error: The trial court found only the specific intent to commit great bodily harm and that finding cannot support a conviction of attempted second degree murder.

The present matter involved a bench trial, and at its conclusion, the trial judge found Smith guilty as indicated above. The trial court found Smith guilty of the lesser charge of aggravated battery as to Mrs. Urban, rather than a third count of attempted second degree murder. During the ruling, the trial court stated the following:

> In terms of Mr. Winters I believe that Mr. Smith had the specific intent to commit great bodily harm; thus, meeting the requirements for attempted second degree murder. As it pertains to Mr. Urban I believe that Mr. Smith had the intent to commit great bodily harm; thus, meeting the requirements for attempted second degree murder.

Smith argues that the above language is indicative that the trial court failed to find the requisite intent to support convictions for the attempted second degree murders of Mr. Urban and Winters, because the court did not fully expand its conclusions to recite Smith had the intent to kill Winters or Mr. Urban. However, during that same oral ruling, the trial court stated:

> The court weighed whether this could have been attempted manslaughter for Winters as well as for Mr. Urban, but I think the actions taken into aggregate and given the most weight to the statements of the defendant himself is what moved these crimes up to the attempted second degree.

Clearly, the trial court was contemplating the various degrees of appropriate criminal statutes most applicable to the facts and circumstances of Smith's actions. Further, as to Mr. Urban, the court stated:

> Defendant took the pistol from him and stood over him; pistol whipped him in front of his wife; he pointed the gun to his

head; and then he drove on top of him. No doubt that the defendant tried to kill him.

Finally, based on the testimony and evidence presented at trial, the court specifically found Smith guilty of the attempted second degree murder of both Winters and Mr. Urban. With the understanding of the clearly worded provisions of Louisiana law relative to the elements of attempted second degree murder, the trial court took into consideration whether the facts supported the conclusion that Smith intended to kill Winters and Mr. Urban and distinguished those actions from those taken against Mrs. Urban. A complete recitation of the Criminal Code provisions is not required when the record clearly contains sufficient evidence that the provisions have been satisfied.

The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004), *State v. Holder*, 50,171 (La. App. 2 Cir. 12/9/15), 181 So. 3d 918, 929, *writ denied*, 16-0092 (La. 12/16/16), 211 So. 3d 1166. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. *State v. Steines*, 51,698 (La. App. 2 Cir. 11/15/17), 245 So. 3d 224, *writ denied*, 17-2174 (La. 10/8/18), 253 So. 3d 797.

The appellate court does not assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d

11

442; *State v. Dale*, 50,195 (La. App. 2 Cir. 11/18/15), 180 So. 3d 528, *writ denied*, 15-2291 (La. 4/4/16), 190 So. 3d 1203. A reviewing court affords great deference to a trial court's decision to accept or reject the testimony of a witness in whole or in part. *State v. Steines*, *supra*.

Thus, this court is charged with examining the evidence in the light most favorable to the prosecution and determining whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.* To sustain a conviction for attempted second degree murder, the state must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. La. R.S. 14:27; 14:30.1. Although the statute for second degree murder allows for a conviction based on "specific intent to kill or to inflict great bodily harm," attempted second degree murder requires the specific intent to kill. *State v. Bishop*, 01-2548 (La. 1/14/03), 835 So. 2d 434. Proof of specific intent to inflict great bodily harm is insufficient for a conviction for attempted second degree murder. *State v. Lewis*, 51,672 (La. App. 2 Cir. 11/15/17), 245 So. 3d 233, *writ denied*, 19-01292 (La. 7/17/20) 298 So. 3d 158; *State v. Patterson*, 50,305 (La. App. 2 Cir. 11/18/15), 184 So. 3d 739, 748, *writ denied*, 15-2333 (La. 3/24/16), 190 So. 3d 1190. Evidence establishing an intent to kill would be required to support a conviction for attempted second degree murder. In this matter, the record is replete with sufficient evidence to support a conclusion that Smith intended to kill Winters and Mr. Urban.

Specific intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1).

12

Such state of mind can be formed in an instant. *State v. Minor*, 52,091 (La. App. 2 Cir. 9/26/18), 254 So. 3d 1278; *State v. Murray*, 49,418 (La. App. 2 Cir. 1/14/15), 161 So. 3d 918, *writ denied*, 15-0379 (La. 4/8/16), 191 So. 3d 582. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. *State v. Bishop*, *supra*. Specific intent to kill may also be inferred from the extent and severity of the victim's injuries, and the defendant's use of a deadly weapon to produce those injuries, which involved serious risk of death. *State v. Washington*, 50,424 (La. App. 2 Cir. 3/16/16), 188 So. 3d 350, *writ denied*, 16-0718 (La. 4/13/17), 218 So. 3d 119. The determination of whether the requisite intent is present is a question for the trier of fact. *State v. Lewis*, *supra*; *State v. Patterson*, *supra*.

Here, Smith argues that the trial court's oral ruling stating that it found that Smith had the intent to cause great bodily harm is insufficient to support a conviction for attempted second degree murder. However, we must examine the entirety of the record to determine whether a rational trier of fact could have found that Smith had the intent to kill Winters and Mr. Urban. A less than exact recitation by the trial court, from memory, on the record of the elements found to exist does not negate the somber reflection and review by the court of the necessary elements based on the facts presented for a conviction. Our task is to review the record in its entirety to determine if a reasonable fact finder could have reached the same conclusion. It is the existence in the record of facts establishing an intent to kill, not the omission while reciting the elements of the crime, that is controlling.

A review of the record reflects that Smith's testimony as to almost every interaction and fact was distinguishable from the testimony of Winters, Mr. and Mrs. Urban, the police officers, and the photographs entered into evidence. Regarding Winters, Smith testified at trial that he never intended to kill him, and instead simply wanted him to pass out. Investigator Miranda Rogers, of the Ouachita Parish Sheriff's Office, testified that when she interviewed Mr. Winters at the hospital on the day of the attack, he told her that Smith had charged at him, attacked him, grabbed him by the throat, thrown him on the concrete, and repeatedly struck his head against the concrete. Before losing consciousness, Mr. Winters reported that Smith told him that he was Jesus and he was going to kill Mr. Winters. Smith's actions appear to be in furtherance of that intention.

Smith and Winters tell different accounts of their interaction. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Patterson*, *supra*; *State v. Glover,* 47,311 (La. App. 2 Cir. 10/10/12), 106 So. 3d 129, *writ denied,* 12-2667 (La. 5/24/13), 116 So. 3d 659.

The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness in whole or in part; the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. *State v. Patterson, supra; State v. Casey,* 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied,* 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000).

14

It appears that the trial court chose to believe the testimony of Winters from the day of the incident rather than the self-serving testimony provided by Smith during his trial. Smith's specific intent to kill can be determined by the circumstances and his actions. He attacked a 76-year-old man, unprovoked, and smashed his head against the concrete until he lost consciousness, and that violent beating only ended when Smith was confronted by Mr. Urban honking his horn and getting out of his vehicle. By his own admission, Smith only stopped beating Winters when he was approached by Mr. Urban. Winters was injured badly enough to require 18 stitches and hospitalization. Winters reported that Smith told him that he was going to kill him. Considering these facts in a light most favorable to the prosecution, any rational trier of fact could conclude that Smith had specific intent to kill Mr. Winters. As such, the elements for conviction of attempted second degree murder are satisfied relative to Winters.

This court must further examine the circumstances of the incident and Smith's actions regarding Mr. Urban to determine if the record supports a finding that a reasonable trier of fact could find Smith had the intent to kill Mr. Urban, when viewed in a light most favorable to the prosecution. Smith and Mr. Urban tell different accounts of their interaction as well. Mr. Urban told police that when Smith charged him, Smith told him he would kill him. Regarding the first time Smith shot at Mr. Urban, Smith testified that although he pointed a gun at Mr. Urban's head, he purposefully moved it so that he would not shoot him in the head. Mr. Urban told police that Smith also placed the gun against his forehead and pulled the trigger a second time but the gun did not discharge. Smith testified that he did not recall dragging Mr. Urban toward the vehicle or running over him twice. He testified that

he did not intend to kill Mr. Urban. His testimony was contradicted by Mr. and Mrs. Urban.

The facts in the record are clear that while struggling with and beating Mr. Urban, Smith pointed the gun at Mr. Urban's head and pulled the trigger. That round fired and hit the dirt and gravel immediately next to and barely missed Mr. Urban's head. Mr. Urban also told police that Smith then pointed the gun at his forehead and pulled the trigger but, luckily, the gun misfired. As noted above, the condition of the pistol, including an empty chamber, a fired chamber, and a misfired bullet in another chamber, support the testimony of Mr. Urban regarding his encounter with Smith.

Louisiana courts have found that the discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill. *Patterson*, *supra*. The trial court indicated that it found Smith's testimony that he purposefully moved the gun because he did not intend to kill Mr. Urban believable. Even if this court takes that as true relative to the first time Smith pulled the trigger, the remainder of the record clearly indicates Smith had the intent to kill Mr. Urban, *i.e.* when he put the gun to his head and pulled the trigger again, then dragged his body in the path of the vehicle, and then drove over him, not once but twice, before aiming the vehicle at Mrs. Urban. Mr. Urban was left with severe injuries, requiring several months of hospitalization, surgeries, and treatment. Mr. and Mrs. Urban testified that this attack had a devastating impact on their lives. The trial court stated unequivocally that it found Smith had the intent to kill Mr. Urban, and this court finds that any reasonable trier of fact could also conclude that Smith had the intent to kill Mr. Urban.

16

Smith told both Winter and Mr. Urban that he was going to kill them, then undertook efforts which clearly were designed and intended to accomplish that result. For the foregoing reasons, this assignment of error is without merit.

Second Assignment of Error: The trial court erred in not finding David Smith not guilty by reason of insanity based on the totality of the circumstances in this case.

In Louisiana, a legal presumption exists that a defendant is sane at the time of the offense. La. R.S. 15:432. To rebut the presumption of sanity and avoid criminal responsibility, the defendant has the burden of proving the affirmative defense of insanity by a preponderance of the evidence. La. C. Cr. P. art. 652; *State v. Silman,* 95-0154 (La. 11/27/95), 663 So. 2d 27; *State v. Johnson*, 43,935 (La. App. 2 Cir. 2/25/09), 3 So. 3d 697. Criminal responsibility is not negated by the mere existence of a mental disease or defect. To be exempted of criminal responsibility, the defendant must show he suffered a mental disease or defect that prevented him from distinguishing between right and wrong with reference to the conduct in question. La. R.S. 14:14. The determination of sanity is a factual matter reserved to the jury or other fact finder. *State v. Sepulvado,* 26,948 (La. App. 2 Cir. 5/10/95), 655 So. 2d 623, *writ denied,* 95-1437 (La. 11/13/95), 662 So. 2d 465. All evidence, including both expert and lay testimony, along with the defendant's conduct and actions before and after the crime, may be considered in determining whether the defendant met his burden of proof on an insanity defense. *Holder*, *supra*. Even where experts opine that the defendant is insane, the issue is for the jury to decide. *State v. Butler*, 50,582 (La. App. 2 Cir. 5/25/16), 197 So. 3d 179; *State v.*

*Horne,* 28,327 (La. App. 2d Cir. 8/21/96), 679 So. 2d 953, *writ denied,* 96-2345 (La. 02/21/97), 688 So. 2d 521.

In reviewing a claim for insufficiency of evidence in an action where the affirmative defense of insanity is raised, the appellate court must determine whether under the facts and circumstances of the case, any rational fact finder, viewing the evidence most favorably to the prosecution, could conclude, beyond a reasonable doubt, that the defendant failed to prove by a preponderance of the evidence that he was insane at the time of the offense. *Holder*, *supra*; *State v. Armstrong*, 94-2950 (La. 04/08/96), 671 So. 2d 307, 309. If there is conflicting evidence on the issue of insanity, the reviewing court should accord great weight to the jury's resolution of the conflicting evidence, provided the jury was properly instructed and no evidence was prejudicially admitted or excluded. *Id.* The jury's decision should not be overturned unless no rational juror could have found the defendant failed to prove his insanity at the time of the offense. *Id.*; *State v. Sharp*, 418 So. 2d 1344 (La. 1982).

Here, the trial court heard testimony from Dr. Pinkston, a psychologist appointed to the sanity commission, Dr. Ragsdale, a psychiatrist who treated Smith, Dr. Vosburg, a forensic psychologist who examined Smith for competency, and Smith's family members, who testified to his increasing delusional behavior and prior hospitalizations. Smith's only treating physician did not state an opinion about whether he believed Smith to be sane at the time of the offense, and he did not perform a forensic psychiatric evaluation on Smith prior to trial. Dr. Pinkston found that Smith was capable of distinguishing right from wrong at the time of the offense. Dr.

18

Vosburg testified that he believed Smith to be insane at the time of the offense, due to his delusions.

In the case of such conflicting evidence, this court must accord great weight to the fact finder's resolution of the conflicting evidence. The fact finder's decision should not be overturned unless no rational trier of fact could have found the defendant failed to prove his insanity at the time of the offense. The trial court, in its oral ruling, stated that it found the testimony of Dr. Pinkston more persuasive than that of Dr. Vosburg. Further, the trial court took into consideration the defendant's actions prior to the crime (leaving the smaller dogs in the car so they would be safe), during the crime (moving the gun away from Mr. Urban's head because he knew it would be wrong to kill him), and after the crime (running away from the police because he did not want to get into trouble). The trial court ultimately found that while Smith clearly suffered from mental illness, he did not meet his burden of proving that he was incapable of distinguishing right from wrong at the time of the offense. The above evidence is sufficient that a trier of fact could reasonably have rejected the defendant's defense. Thus, we conclude this assignment of error is without merit.

Assignment of Error Number Three: The sentences imposed in this matter are unconstitutionally harsh and excessive given the facts and circumstances of the case. In particular, the trial court imposed sentences totaling 35 years at hard labor on a first offender suffering mental health issues and imposed a suspended sentence and a substantial order for restitution on his release.

Ordinarily, appellate review of sentences for excessiveness is a two-step process, the first being an analysis of the district court's compliance with the sentencing guidelines of La. C. Cr. P. art. 894.1 and the second being an analysis of the sentence for constitutional excessiveness. However, review is limited to the second step when a defendant fails to file a motion to

reconsider sentence in the lower court. *State v. Mims*, 619 So. 2d 1059 (La. 1993); *State v. Pittman*, 52,027 (La. App. 2 Cir. 4/11/18), 248 So. 3d 573; *State v. Bailey*, 50,097 (La. App. 2 Cir. 9/30/15), 180 So. 3d 442; *State v. Osborne*, 48,662 (La. App. 2 Cir. 1/15/14), 130 So. 3d 1012. Failure to file a motion to reconsider sentence includes the failure to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, and it shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review. La. C. Cr. P. art. 881.1(E). As noted above, Smith's trial counsel failed to file a motion to reconsider sentence, and as such, we will limit our review to an analysis of constitutional excessiveness of Smith's sentence.

Constitutional review turns upon whether the sentence is illegal, grossly disproportionate to the severity of the offense, or shocking to the sense of justice. *State v. Lobato*, 603 So. 2d 739 (La. 1992); *Pittman, supra*; *State v. Davis*, 50,149 (La. App. 2 Cir. 11/18/15), 181 So. 3d 200; *State v. Scott*, 50,920 (La. App. 2 Cir. 11/16/16), 209 So. 3d 248, *writ denied*, 17-0353 (La. 11/13/17), 229 So. 3d 478.

A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So. 2d 1276 (La. 1993); *State v. Davis*, 52,453 (La. App. 2 Cir. 2/27/19), 265 So. 3d 1194. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 01-

20

0467 (La. 1/15/02), 805 So. 2d 166; *State v. Boehm*, 51,229 (La. App. 2 Cir. 4/5/17), 217 So. 3d 596.

The trial judge is given wide discretion in the imposition of sentences within the statutory limits, and the sentence imposed should not be set aside as excessive in the absence of a manifest abuse of his discretion. *State v. Williams*, 03-3514 (La. 12/13/04), 893 So. 2d 7; *State v. Diaz*, 46,750 (La. App. 2 Cir. 12/14/11), 81 So. 3d 228. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Williams, supra*; *State v. Free*, 46,894 (La. App. 2 Cir. 1/25/12), 86 So. 3d 29.

Here, the trial court imposed the following sentences: 30 years for the attempted second degree murder of Mr. Winters; 30 years for the attempted second degree murder of Mr. Urban; 30 years for one count of armed robbery, with a consecutive 5 year sentence for the firearm enhancement; 5 years at hard labor for one count of aggravated battery of Mrs. Urban; 20 years for one count of second degree robbery; 10 years at hard labor without the benefit of probation, parole, or suspension of sentence for one count of carjacking; and 5 years, suspended, and 5 years of probation for the one count of aggravated criminal damage to property. All of the above sentences were ordered to be served concurrently, except the 5-year firearm enhancement, which was to be served consecutively. The court also ordered Smith to pay restitution in the amount of $25,000.00 in connection with the aggravated criminal damage to property charge.

This court finds that the imposition of 35 years' hard labor is not constitutionally excessive. Each of the above sentences is less than the maximum allowed under the applicable statute, and Smith could have been

21

sentenced to over 100 years in prison for his actions. This case involves the unprovoked and brutal attack of three elderly people, and the sentences imposed do not shock the sense of justice, nor are they grossly disproportionate to the offenses for which Smith was convicted. The trial court was within its discretion in imposing the sentences, and this court cannot find that its purpose was to needlessly inflict pain and suffering. For the foregoing reasons, this assignment of error is without merit.

Smith also argues in brief that the $25,000 in restitution imposed by the trial court is not supported by the record. Pursuant to La. C. Cr. P. art. 895.1(A)(1), "[w]hen a court places the defendant on probation, it shall, as a condition of probation, order the payment of restitution in cases where the victim or his family has suffered any direct loss of actual cash, any monetary loss pursuant to damage to or loss of property, or medical expense." Similarly, La. C. Cr. P. art. 895(A)(7) gives the trial court discretion to impose an order of restitution to an "aggrieved party" that has suffered a pecuniary loss. The trial court shall order "restitution in a reasonable sum not to exceed the actual pecuniary loss to the victim in an amount certain." La. C. Cr. P. art. 895.1(A)(1). The court must also order the restitution payment to be made either in a lump sum or in monthly installments based on the earning capacity and assets of the defendant. *Id.*

In *State v. Jarratt*, 53,525 (La. App. 2 Cir. 6/24/20), 299 So. 3d 1202, 1214, this court reviewed a restitution order issued by a trial court that failed to make a finding regarding the defendant's ability to actually make restitution, did not indicate that it had analyzed his earning capacity and assets before ordering restitution and costs, failed to set forth a payment plan, and ordered a restitution amount without any documentary evidence or

financial records in support thereof. There, we found that Louisiana law requires that the amount of restitution be determined by the trial court, and that it be paid in lump sum or monthly installments depending on the defendant's earning capacity and assets. Failing to make an inquiry into the defendant's abilities and assets and failure to set a determinate payment schedule for restitution is error patent and requires that the sentence be vacated and the case remanded for resentencing. *Id.* We further noted that Louisiana law requires a showing of actual pecuniary loss and the testimony of a witness without any documentary evidence or financial records in support is insufficient to satisfy this burden. *Id.*

In the present matter, we find that while the damages may well exceed $25,000, such a restitution order is speculative without specific information regarding the damage to the Urban vehicle and home or medical expenses and is therefore not supported by the evidence in the record as it currently exists. The record does not reflect receipts for the repair of the Urban home or vehicle due to damage from Smith's actions or evidence of their medical expenses, and without such, this court is unfortunately in no position to determine whether such restitution is appropriate under the circumstances.

We also observe that Smith was sentenced on November 7, 2019. On August 1, 2019, La. C. Cr. P. art. 875.1, "Determination of substantial financial hardship to the defendant," became effective and is applicable to this case. For sentences imposed after August 1, 2019, Art. 875.1C(1) requires a hearing in the district court to determine whether any "financial obligations," which are defined in paragraph B as "any fine, fee, cost, restitution, or other monetary obligation," will impose undue hardship on the

23

defendant or his dependents. *Jarratt*, *supra*. This hearing cannot be waived. *Id*.

Considering this, Smith's conviction for aggravated criminal damage to property is affirmed, but the sentence is vacated and remanded for resentencing so that the trial court may undertake the prescribed steps to determine and substantiate the amount of restitution awarded, the ability of Smith to pay, and the manner and frequency of such payments, in accordance with Louisiana law and jurisprudence.

**ERRORS PATENT**

There is a discrepancy between the minutes and the transcript of the sentencing hearing held on November 7, 2019. La. C. Cr. P. art. 871(A) provides that a "[s]entence shall be pronounced orally in open court and recorded in the minutes of the court." When there is a discrepancy between the minutes and the transcript, the transcript prevails. *State v. Burns*, 53,250 (La. App. 2 Cir. 1/15/20), 290 So. 3d 721; *State v. Lynch*, 441 So. 2d 732 (La. 1983).

The transcript indicates that the sentences imposed for the two counts of attempted second degree murder,[1] second degree robbery,[2] and armed robbery[3] failed to state that they were imposed with hard labor or with restricted benefits.

---

[1] La. R.S. 14:27 states, in pertinent part: "D. Whoever attempts to commit any crime shall be punished as follows: (1)(a) If the offense so attempted is punishable by death or life imprisonment, he shall be imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence." Further La.R.S. 14:30.1 provides, in pertinent part: "B. Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence."

[2] Whoever commits the crime of second degree robbery shall be imprisoned at hard labor for not less than three years and for not more than forty years. La. R.S. 14:64.4(B).

[3] Whoever commits the crime of armed robbery shall be imprisoned at hard labor for not less than ten years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence. La. R.S. 14:64(B).

24

A defendant in a criminal case does not have a constitutional right or a statutory right to an illegally lenient sentence. *State v. Williams*, 00-1725 (La. 11/28/01), 800 So. 2d 790. An illegally lenient sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review. La. C. Cr. P. art. 882(A). This correction may be made despite the failure of either party to raise the issue. *State v. Williams*, *supra*; *State v. Leday*, 05-1641 (La. App. 3 Cir. 5/3/06), 930 So. 2d 286.

The failure to impose hard labor is harmless and self-correcting when there is a mandatory felony requiring any sentence to be served at hard labor. *State v. Burns*, *supra*; *State v. Thomas*, 52,617 (La. App. 2 Cir. 5/22/19), 272 So. 3d 999, *writ denied*, 19-01045 (La. 2/10/20) 292 So. 3d 61; *State v. Foster*, 50,535 (La. App. 2 Cir. 4/13/16), 194 So. 3d 674. When the trial court fails to order that a portion of a sentence be served without benefits as statutorily mandated, the sentence will be automatically served without benefits for the requisite time period. *State v. Williams*, 52,618 (La. App. 2 Cir. 4/10/19), 268 So. 3d 1241, 1250; *State v. Jones*, 48,505 (La. App. 2 Cir. 11/20/13), 128 So. 3d 622; La. R.S. 15:301.1(A).

Because La. R.S. 14:27, 14:64.4, and 14:64 are mandatory felonies requiring any sentence to be served at hard labor, the error is harmless and self-correcting. Similarly, La. R.S. 14:27 and 14:64 statutorily mandate that a portion of the sentence be served without benefits, and the trial court's failure to declare that those sentences be served with restricted benefits is harmless and self-correcting.

Finally, the trial court failed to advise Smith of his right to appeal or of the time limitations for post-conviction relief. La. C. Cr. P. art.

25

930.8(C) provides that at the time of sentencing, the trial court shall inform the defendant of the prescriptive period for post-conviction relief either verbally or in writing. Accordingly, we advise Smith that no application for post-conviction relief shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C. Cr. P. arts. 914 or 922.

## CONCLUSION

For the foregoing reasons, we affirm Smith's convictions and sentences for the attempted second degree murder of Winters and Mr. Urban; we also affirm all of Smith's convictions and sentences for aggravated battery, second degree robbery, carjacking, and armed robbery; and we affirm Smith's conviction for aggravated criminal damage to property, vacate the sentence and restitution, and remand that matter to the trial court for resentencing in accordance with the principles and instructions set forth hereinabove. This matter is further remanded to the trial court to correct the minutes. Finally, the defendant is notified that he has two years to file for post-conviction relief, commencing from the finality of this conviction and sentence.

**CONVICTIONS AND SENTENCES FOR ATTEMPTED SECOND DEGREE MURDER, AGGRAVATED BATTERY, SECOND DEGREE ROBBERY, CARJACKING, AND ARMED ROBBERY AFFIRMED; CONVICTION FOR AGGRAVATED CRIMINAL DAMAGE TO PROPERTY AFFIRMED; SENTENCE AND RESTITUTION FOR AGGRAVATED CRIMINAL DAMAGE TO PROPERTY VACATED; REMANDED WITH INSTRUCTIONS.**

**STEPHENS, J., dissenting in part.**

For the reasons set forth below, I respectfully dissent from that part of this Court's opinion in which Smith's convictions for attempted second degree murder are affirmed.

While a verdict of second degree murder can rest upon a finding of specific intent to kill *or* inflict great bodily harm, attempted second degree murder requires specific intent to kill. *State v. Bishop*, 01-2548 (La. 1/14/03), 835 So. 2d 434, and the determination of whether the requisite intent is present is a question to be decided by the trier of fact. *State v. Patterson*, 50,305 (La. App. 2 Cir. 11/18/15), 184 So. 3d 739.

In this case, the trier of fact was the trial judge. In rendering his verdicts of attempted second degree murder, the judge made several troubling statements on the record as to the *mens rea* applicable to the completed act of second degree murder, *intent to commit great bodily harm*, as he was analyzing the evidence and testimony. Furthermore, there is sufficient ambiguity in the testimony as to whether the defendant possessed the actual intent required to support either conviction of attempted second degree murder. The court's misstatement as to an essential element of the crime of conviction, together with the equivocal proof of that same element of the offense, cannot be overlooked as harmless error.

As to all other convictions, I concur.

1